

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00229-CV

JAYSON STEELE                                              APPELLANT

V.

CITY OF SOUTHLAKE, TEXAS,                                  APPELLEES
AND WADE GOOLSBY, IN HIS
OFFICIAL CAPACITY AS CHIEF OF
POLICE SOUTHLAKE
DEPARTMENT OF PUBLIC
SAFETY

----------

## FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

In four issues, appellant Jayson Steele appeals the trial court's order granting the motion for summary judgment and plea to the jurisdiction of appellees City of Southlake, Texas (Southlake) and Wade Goolsby, in his official capacity as chief of police for the Southlake Department of Public Safety (SDPS). We affirm.

## Background Facts

Appellant worked for Southlake as a police sergeant with a primary responsibility of patrol. In 2005, Goolsby, who was licensed as a police officer in 1980, became Southlake's Chief of Police Services.

According to appellant, in 2006, he began to learn about possible crimes being committed by employees of Southlake's police department. For example, appellant heard that a sergeant had forced a detective to change information in an offense report, and appellant believed that this act comprised official oppression or tampering with a governmental record.[1] Appellant also believed that the department had set up an improper system of evaluating officers by the number of citations that they had issued.[2] Based on instances occurring in 2006 and 2007, which appellant described in an affidavit, he further believed that a pattern was developing of supervisors improperly interfering with cases, recalling cases that had already been submitted to the Tarrant County District Attorney, suggesting "in-house probation" for offenders, and "selectively enforcing the law" when the suspects were prominent members of the community or students of Southlake Carroll High School. Appellant says that through an anonymous survey, he reported some of his complaints about these actions to City Manager

---

[1]*See* Tex. Penal Code Ann. §§ 37.10(a), 39.03(a) (West 2011).

[2]*See* Tex. Transp. Code Ann. § 720.002(a) (West 2011) (prohibiting traffic offense quotas).

Shana Yelverton. Appellant also discussed the alleged improprieties with Lieutenant Michael Kenny.

In the summer of 2007, a group of Southlake's police officers, including appellant, approached the Tarrant County District Attorney's Office with concerns about Chief Goolsby's handling of police incidents and investigations. Appellant asserts that he made good faith reports of misconduct to an investigator with the district attorney's office and two Texas Rangers' sergeants. In addition to some of the facts discussed above, appellant told the investigator about how Chief Goolsby allegedly told officers to falsify workers' compensation claims when they were injured in off-duty jobs. The district attorney's office investigated the concerns.[3] A grand jury listened to witnesses speak about the department's alleged improprieties, but the grand jury did not issue criminal charges.

---

[3]Following its investigation, in February 2008, the district attorney's office issued a report noting that a "sizeable faction" of Southlake's police officers had serious concerns about Chief Goolsby's leadership. The district attorney concluded that the allegations had not established criminal events, but the report stated, "[T]he conclusion of the investigation should not be taken as weight for one side or the other in the ongoing debate of police practices in the City." The report also stated that although the district attorney had forwarded some concerns about the police department's practices to Southlake's management, the district attorney did not have the "authority, the time, or the resources . . . to investigate every one of the 56 officers in the department with regard to vague rumors against them."

In October 2007, appellant and Southlake's Director of Public Safety Jim Blagg[4] exchanged e-mails about appellant's concern that Chief Goolsby endorsed "unethical" behavior. Blagg wrote to appellant that appellant's "snipping and knit-picking every word that anyone in a Supervisory role in [S]DPS sa[id] or [wrote was] causing continuous strife that [was] unnecessary." Appellant says that after his exchange with Blagg, Chief Goolsby changed appellant's work status to a "less desirable position."

On January 9, 2008, Southlake's mayor, Andy Wambsganss, along with one of Southlake's city council members, Laura Hill, received an e-mail from someone who identified himself only as "SDPS Officer." The e-mail, which was sent from southlakeneedshelp@live.com, contained information on SDPS personnel that Councilmember Hill believed was confidential and should not have been disclosed.[5] Specifically, the e-mail stated in part,

---

[4]As the director of public safety, Blagg oversaw the city's police and fire divisions, which comprise the SDPS. Thus, Chief Goolsby was subordinate to Blagg. Blagg was also the city's deputy city manager.

[5]Mayor Wambsganss and Councilmember Hill stated that when they received the e-mail, they were aware that the district attorney's office was investigating activities in the police department but were not aware of the specific subjects of the investigation or the identity of the people who had complained to the district attorney. Yelverton stated that she was also aware of the district attorney's investigation and that appellant had been involved in the investigation. Yelverton explained that she "fully and completely cooperated with" the district attorney's office during the investigation.

4

As you may or may not know, Lt. Michael Kenny was fired today.

This is a great injustice as he was one of the major forces behind exposing the wrong doing being conducted by our police administration. Cases have been dropped or lowered without just cause. The cases were not mishandled. There were not any obstacles to prosecution. They were simply interfered with. The fact that the parents of the children involved are high profile certainly adds an air of suspicion as to the motives Chief Goolsby has for interfering because there are no other reasons. In fact, there [is] a series of lies that have been spoken by Chief Goolsby that are being investigated by a Tarrant County Grand Jury as to why one of these cases was dropped. Lt. Kenny gave Assistant City Manager Blagg proof of these lies . . . . Instead of acting on this proof, Blagg has buried it and ignored it.

Lt. Kenny gave Blagg written proof that Chief Goolsby used city personnel, services, and equipment for personal gain. . . .

Lt. Kenny was on paid administrative leave for over three months after he made the claim which was later substantiated by Blagg and for which Goolsby received a verbal reprimand. . . . Now Goolsby's $5.00 theft has cost the city tens of thousands to cover up. Besides, theft is theft. If your police chief is comfortable stealing any amount, you should have a problem with that. All of this was done while Lt. Kenny was an active witness of a Grand Jury investigation. . . .

City administrators are acting like children hiding their report cards from the parents. Only in this case, you are the parents. Officers have brought allegations of case fixing, orders to violate the civil rights of citizens, ticket quotas, inefficiency, and incompetence to Blagg . . . . Nothing was investigated. . . . Blagg does not want to know the real problems. Neither does [Yelverton]. They do not want you to know either. . . .

. . . .

So far in the last couple of years that they have been here, Blagg and Goolsby have brought shame and embarrassment to the city by the appearance of inappropriate relationships influencing hiring, Blagg paying himself to hire himself, a Grand Jury investigation, and lies made in print and on television regarding an inappropriately dropped case. Chief Goolsby appeared in two

5

endorsements for Roxanne Taylor Realty in full police uniform, in violation of police department and city policy . . . .[6] Goolsby tells Blagg he didn't know the commercial was being shot and he just walked in on accident . . . .

    . . . .

    The city advertises I2ACT as [its] slogan for core values to its employees. Integrity is the first word in that slogan and it very well should be. City administration preaches integrity and yet covers the truth when it is brought to their attention. Integrity for all but the police chief who should be the most honest and unimpeachable in the entire city. . . .

    The police department is in poor shape and [is] getting worse. Approximately 25% of the police department [is] either retiring or looking elsewhere for jobs. That number will grow if indictments are not returned by the Grand Jury. Many have lost faith in the city altogether after repeated attempts to report their activities have been met with indifference and retaliation. Chief Goolsby recently hired a police recruit . . . that had been caught smoking marijuana in his car while he was employed as a corrections officer . . . . [A sergeant] was recently investigated by the DEA for purchasing Human Growth Hormone illegally over the internet. He claimed to not know that it was illegal to do so and that it was medically necessary for him. . . .

    The DEA has turned him as a witness for the prosecution against the online pharmacy. However, he was not disciplined by Chief Goolsby. Is this the message that Southlake wants to send to [its] youth? . . .

    I don't know what relationships the city administrators have that have caused them to circle the wagons so fiercely and protect the criminal activities that have occurred but, regardless if indictments are returned, the Grand Jury investigation will be public record and the testimony of your officers will shock you and your constituents.

---

[6]An SDPS general order prohibits employees from recommending the "procurement of a particular product, professional service, or commercial service."

Councilmember Hill provided a copy of the e-mail to SDPS so that it could look into the e-mail's allegations and determine whether someone had improperly accessed confidential information.[7] Chief Goolsby received the e-mail. He believed that the e-mail disclosed confidential information and that the department needed to learn who sent it to discern whether a security breach had occurred. He also believed that the facts recited in the e-mail were incomplete and misleading.

Captain Rusty Daniels led an investigation into the source of the e-mail and into how that source had learned about the issues addressed in the e-mail.[8] He interviewed several of the police department's employees, who all denied having any knowledge about who sent the e-mail, and he required many employees to answer written questions about the sending and content of the e-mail. According to Captain Daniels, the investigation into the anonymous e-mail required a "very substantial expenditure" of his time.

---

[7]Councilmember Hill swore in an affidavit that her decision to turn over the January 9, 2008 e-mail to SDPS was not retaliatory but was borne out of a concern that SDPS needed to be aware of the e-mail's allegations. She and Mayor Wambsganss stated that they did not interpret the January 9 e-mail as making a complaint under the city's ethics code because there was no reference to a particular provision of the code and there was no request for the city council to take any particular action.

[8]Chief Gooslby says that he directed Captain Daniels to investigate the source of the e-mail but did not participate in Captain Daniels's investigation.

On January 23, Mayor Wambsganss and Councilmember Hill received another email from southlakeneedshelp@live.com. That e-mail, which purported to be sent by retired police officer Quentin Watkins, stated,

> I sent my letter to you so that you would see the truth. My feelings about you were apparently wrong. I left the department last year. I left because of the reasons I wrote about and others. I figured if I told you that you would see me as an ex-employee with a grudge. I hear that you just turned this information over to city management who . . . started a witch hunt in the police department. What you are allowing to happen to [Lt. Kenny] is wrong but I guess you will figure that out when it goes to court.

Captain Daniels spoke to Watkins, and Watkins said that he had not sent the e-mails. Watkins said that appellant had asked permission to use Watkins's name to send the second e-mail but that he had not given appellant permission. On January 25, Watkins sent a notarized memo to Captain Daniels that stated in part,

> I have no idea what was said in either email because I did not write them. I told Capt. Daniels that I had been contacted by [appellant] by phone earlier in the week at which time [appellant] told me that an email had been sent to a City [councilmember] and now [SDPS] management was coming down hard on . . . personnel attempting to find out who wrote the email. [Appellant] said that there was an internal affairs investigation being conducted and that those involved in the email . . . could be in a lot of trouble. [Appellant] went on to ask if he could write an email using my name . . . .
>
> . . . .
>
> I did not give anyone permission to use my name in any email sent to the City of Southlake or to a City [councilmember].

Captain Daniels asked appellant to answer several questions about the e-mails in writing, and appellant did so on January 29. He admitted to sending the

8

e-mails and stated that he had received permission to use Watkins's name.[9] Also on January 29, an attorney wrote a letter to Chief Goolsby to state that he had been retained by appellant and to express his belief that appellant was protected by the Whistleblower Act.[10] Part of the letter stated, "I certainly hope that the City and/or the Department and yourself will not retaliate against Sgt. Steele for the information he has provided to the Tarrant County District Attorney's Office." Captain Daniels also interviewed appellant more than once. Appellant said that he had used Watkins's name for "self preservation" because he knew that the investigation was "closing in on him." He expressed his belief that Watkins had denied granting appellant permission to use Watkins's name because Watkins was running for a political office.

SDPS placed appellant on administrative leave with pay and benefits and precluded him from performing any police work. On February 5, Captain Daniels formally asserted fifteen potential grounds for misconduct against appellant associated with appellant's sending of the e-mails. Captain Daniels classified the

---

[9]In his affidavit, appellant says that he sent the January 9 e-mail because he was required to report unethical conduct to the city council; he claims that he sent the e-mail anonymously for fear of retaliation.

[10]*See* Tex. Gov't Code Ann. §§ 554.001–.010 (West 2004); *Tarrant Cnty. v. McQuary*, 310 S.W.3d 170, 173 (Tex. App.—Fort Worth 2010, pet. denied) ("The Whistleblower Act has a twofold purpose: (1) protecting a public employee from retaliation by her employer when, in good faith, the employee reports a violation of law, and (2) securing lawful conduct on the part of those who direct and conduct the affairs of public bodies.").

fifteen grounds into appellant's alleged violations of four of SDPS's written policies that

- prohibited unbecoming conduct, including "discourtesy or conduct which [brought] the department into disrepute or reflect[ed] discredit upon the individual as an employee of [SDPS], or that which impair[ed] the operation or efficiency of the Department or individual";[11]

- required SDPS employees to be truthful in all verbal statements and written documentation because truthfulness was "essential and expected when dealing with a single employee or the public";[12]

- required SDPS employees to follow federal, state, and local laws;[13] and

- mandated that employees could not disseminate confidential information to unauthorized people for any purpose.[14]

Appellant responded in writing to Captain Daniels's fifteen allegations of misconduct on February 7. Among other parts of his response, appellant expressed his beliefs that information he had included in the January 9 e-mail was public information under chapter 552 of the government code, that he was authorized to disclose the information to city officials under Southlake's employee

---

[11]Captain Daniels alleged that appellant had made disparaging remarks about Blagg's, Chief Goolsby's, and Yelverton's integrity in the January 9 e-mail.

[12]Captain Daniels alleged that appellant had been untruthful, in part, by sending the January 23 e-mail while claiming that Watkins had sent it along with January 9 e-mail.

[13]For example, Captain Daniels asserted that appellant had committed forgery under the penal code by using Watkins's name on the January 23 e-mail.

[14]Captain Daniels alleged that appellant had divulged confidential information about an employment background investigation, the firing of Lieutenant Kenny, an internal affairs investigation, a grand jury investigation, and an ongoing criminal investigation.

handbook because the information concerned illegal or unethical conduct and violations of Southlake's policies, that he had not been told by anyone to not release the information, that he had not "released" confidential information at all because he did not send the e-mails to anyone outside of Southlake's government, and that Watkins had allowed him to use Watkins's name to send the second e-mail. One of Captain Daniels's fifteen allegations stated, "On January 23, 2008[,] you were untruthful when you sent a second email to the City of Southlake Mayor and Councilmember Laura Hill taking responsibility for sending the first email, however claiming to be retired Southlake Officer Quentin Watkins." Appellant responded to this allegation by stating, "Given the lengths to find me, I think my response was justified." The last paragraph of appellant's response stated,

> I find it interesting that I am being charged with 15 separate counts of policy violations and yet most of the issues I brought forth in my email have been completely ignored. I have report[ed] policy violations, ethics code violations, and violations against the laws of the State of Texas, all in good faith, and yet I am the one being investigated.

Captain Daniels eventually recommended that thirteen of the fifteen grounds be sustained.

The "Complaint Summary" portion of Captain Daniels's written investigation report stated,

> On January 9, 2008[,] an email was received by a member of the Southlake City Council which contained confidential information concerning the background of SDPS Police Services personnel, internal affairs investigations, disciplinary actions taken, the identity

11

of witnesses involved in [ongoing] criminal cases, and information concerning a Tarrant County Grand Jury investigation. It also contained information purported to be fact that actually was false or misleading. In addition to the information released, there were numerous derogatory comments concerning the integrity of the City Manager, Director of Public Safety, and the Chief of Police.

Due to the nature of the confidential information released, an administrative review was initiated. The scope of the review was to determine the identity of the person responsible for composing and sending the email. On January 18, 2008[,] interviews with SDPS personnel began. On January 23, 2008[,] a second email was received. In this email, the composer identified [himself] as retired Southlake Police Officer Quentin Watkins.

As a result of this investigation, the composer of both emails was identified as [appellant]. As a result of [appellant's] actions, it was alleged he violated SDPS policy, thus the ongoing administrative review was changed to an internal affairs investigation.

Captain Daniels's report then detailed the contents of various statements that he had received from witnesses who he had talked to in the investigation, including appellant, Watkins, Councilmember Hill, and Blagg.

Chief Goolsby asked Lieutenant Ashleigh Douglas, appellant's supervisor, to review Captain Daniels's investigation report and provide her opinions on the allegations it contained. On March 3, 2008, Lieutenant Douglas issued a memo stating that she had reviewed Captain Daniels's report. Lieutenant Douglas opined that eight of Captain Daniels's alleged grounds of appellant's misconduct be sustained, including two of the grounds relating to appellant's untruthfulness, but she recommended demotion, rather than termination, as appellant's discipline. Lieutenant Douglas recognized that the "operation and efficiency of

12

the Department was temporarily impaired when several supervisory members of the department were diverted from their normal duties to conduct the investigation and subsequent reviews of the investigation." Appellant says that Lieutenant Douglas told him that Chief Goolsby tried to get her to alter her recommendation of demotion.

On March 4, 2008, appellant submitted a hostile work environment complaint to Yelverton. The complaint alleged several incidents of misconduct by SDPS, some of which appellant stated that he had already reported to the district attorney's office, including that

- in December 2006, a sergeant made a detective change parts of a report to reflect a lower charge for a robbery at a Wendy's restaurant, which appellant believed could qualify as official oppression under the penal code;

- in May 2007, a sergeant repressed the investigation of a drug case although the evidence supported a charge;

- in May 2007, a sergeant improperly influenced the lowering of a charge after a detective had already filed a case with the district attorney's office;

- Chief Goolsby provided false excuses to officers about why the Tarrant County District Attorney's office had not prosecuted cases;

- Chief Goolsby and Captain Daniels ordered supervisors to evaluate officers based on the number of citations that they issued each month;

- Chief Goolsby tampered with a governmental record in connection with appellant's 2005 performance appraisal;

- during an August 2007 meeting, Chief Goolsby implied that officers should conceal their off-duty status if they got injured while working off duty so that they could collect workers' compensation benefits;

13

- Chief Goolsby suppressed an investigation into the circumstances of someone's death when detectives believed that the death was suspicious; and

- appellant disclosed allegations about Chief Goolsby's misconduct to Blagg, but Blagg "never sought trained criminal investigators to look into these allegations."

In the complaint, appellant also expressed his opinions that in several circumstances, he was treated unfavorably for reporting these allegedly unethical behaviors by officers in the department and that the allegations of misconduct that had been made against him were retaliation for the allegations that he had made against the police administration. Yelverton had received the district attorney's report by the time appellant presented his hostile work environment complaint.

Yelverton appointed Marigny Lanier, an attorney, to investigate the hostile work environment complaint.[15] On March 16, 2008, appellant sent a memo to Yelverton titled, "Hostile Work/Harassing Environment Complaint Amendment." In the memo, appellant alleged that Chief Goolsby had discussed details of the internal affairs investigation concerning appellant with other officers. Appellant stated that "[i]nternal affairs investigations . . . are protected against the information being distributed to preserve the integrity of the investigation." Between March 24 and April 17, Lanier interviewed appellant, Blagg, Captain

---

[15]In her affidavit, Yelverton stated that she considered the hostile work environment complaint "very seriously," that she directed Lanier to not dismiss the complaint on a technicality, and that the City paid thousands of dollars for Lanier's investigation.

Daniels, Chief Goolsby, Lieutenant Kenny, Yelverton, and others. Appellant claims that Lanier did not adequately investigate his complaint.

Chief Goolsby reviewed Captain Daniels's report and Lieutenant Douglas's review of the report. Chief Goolsby issued a memo that sustained six of the fifteen allegations of misconduct, including allegation number ten, concerning "Truthfulness," because Chief Goolsby found that appellant had "intentionally used another person's name as the author of an e-mail in order to avoid detection and divert attention." Chief Goolsby also sustained all four of the "Unbecoming Conduct" allegations, stating that appellant's "statements of 'fact' were based on rumors, opinions, and third-party information" and that the method appellant used to express his concerns was "unprofessional and inexcusable." Chief Goolsby fired appellant in May 2008.

On May 8, 2008, Yelverton informed appellant by a letter that Lanier had completed her investigation and that based on Lanier's written report, Yelverton had found that appellant had not been subjected to a hostile work environment in retaliation for reporting his concerns about Chief Goolsby. In the report, Lanier concluded that appellant had not made good faith reports of violations of law, although Lanier said, with respect to appellant's claim that Chief Goolsby had imposed a ticket quota, that the good faith issue was a "close question." Lanier also determined that appellant had not suffered discriminatory and adverse personnel actions or harassment because of the reports he had made; she found appellant's arguments in that regard to be speculative.

15

Through Southlake's grievance policy, on May 15, appellant appealed Chief Goolsby's termination decision to Blagg, although appellant objected to Blagg deciding the appeal because Blagg had been named in appellant's hostile work environment claim. Blagg declined to recuse himself because he believed he could act fairly toward appellant. As part of the appeal, appellant criticized much of Captain Daniels's report and alleged that Watkins had allowed him "to use [Watkins's] name regardless of what pressure from the department made him recant."[16] On June 10, Blagg met with appellant, appellant's attorney, Southlake's attorney, and a human resources analyst. Blagg also considered Daniels's report and Douglas's review of Daniels's report. On June 13, Blagg sustained appellant's termination on the bases that (1) appellant had intended to deceive the department with his e-mails and to "interfere with or prevent the department from ascertaining the identity of the author of the [January 9] email"; and (2) in the January 9 e-mail, appellant had made "purportedly factual statements based on rumor and hearsay, something a reasonable officer should know to avoid." Blagg sustained six of the fifteen grounds for misconduct that Captain Daniels had asserted.

---

[16]Appellant voluntarily took a polygraph examination on June 4, 2008, and the examiner determined that appellant was not being deceptive when he stated that Watkins had told him that he could use Watkins's name to send the January 23 e-mail. SDPS could have required appellant to take a polygraph examination during the internal affairs investigation.

Appellant appealed Blagg's decision to Yelverton. On June 20, appellant sent a memo to Yelverton to argue for his reinstatement. The memo included appellant's assertions that Lanier's investigation had been "wrought with errors." In the memo, appellant also said, "I know that I have made mistakes in this situation[,] but there is not a single person involved in this series of incidents that can claim innocence of all fault." Appellant met with Yelverton on July 22, and several days later, after Yelverton had interviewed Watkins and had considered Captain Daniels's report, Lieutenant Douglas's review, and the termination findings of Chief Goolsby and Blagg, Yelverton upheld the termination. According to her affidavit, her decision was based on the tenth and eleventh allegations of misconduct that Captain Daniels had generated, which both concerned untruthfulness. In the affidavit, Yelverton said that the investigation into the source of the e-mails was required to determine whether there had been a breach of security. She also noted that appellant's actions in sending the e-mails were "deceptive whether or not he had [Watkins's] permission."

In August 2008, appellant sued Southlake "for retaliating against him" in violation of the Whistleblower Act. Appellant asserted that his reports about SDPS's alleged misconduct caused his termination, and he sought compensatory damages, reinstatement as a sergeant, and attorney's fees. Appellant later amended his petition several times; among other effects, the amendments added Chief Goolsby as a defendant.

In December 2010, in one document, appellees filed a motion for summary judgment and a plea to the jurisdiction. In their motion, appellees contended in part that appellant had been fired because he was untruthful when sending the January 2008 e-mails rather than because of the substance of his reports about SDPS's alleged wrongdoing. Appellees also asserted that appellant had no evidence to support his claims. Appellant responded to appellees' motion and plea, contending that he was "ultimately terminated for making the report of criminal violations against [Chief Goolsby] and other employees to the Tarrant County District Attorney."

Appellees objected to much of appellant's summary judgment evidence, including almost all of appellant's affidavit, and appellees noted that appellant had not contested that his termination would have occurred regardless of his status as a whistleblower. The trial court sustained several of the objections, granted appellees' motion for summary judgment and plea to the jurisdiction without specifying a reason for doing so, and dismissed all of appellant's claims with prejudice. Appellant brought this appeal.[17]

---

[17]Appellant does not challenge the trial court's decision to grant summary judgment against his claim under chapter 614 of the government code, and we therefore affirm the summary judgment as to that claim. *See Torres v. Johnson*, 91 S.W.3d 905, 908 n.3 (Tex. App.—Fort Worth 2002, no pet.) (explaining that we must affirm summary judgments on unchallenged grounds).

**Appellant's Whistleblower Act Claim**

In his second issue, appellant argues that appellees did not conclusively establish their affirmative defense and that the trial court therefore erred by granting their motion for summary judgment. We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c). To accomplish this, the defendant-movant must present summary judgment evidence that conclusively establishes each element of the affirmative defense. *See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008).

Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999); *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 665 (Tex. App.—Fort Worth 2010, no pet.). When a trial court does not specify the

ground relied on for granting summary judgment, the summary judgment will be affirmed on appeal if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Hanson v. Greystar Dev. & Constr., LP*, 317 S.W.3d 850, 852 (Tex. App.—Fort Worth 2010, pet. denied).

"A state or local governmental entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law[18] by the employing governmental entity or another public employee to an appropriate law enforcement authority." Tex. Gov't Code Ann. § 554.002(a); *see City of El Paso v. Parsons*, 353 S.W.3d 215, 225 (Tex. App.—El Paso 2011, no pet.). A violation of section 554.002 waives governmental immunity. *State v. Lueck*, 290 S.W.3d 876, 878 (Tex. 2009); *see* Tex. Gov't Code Ann. § 554.0035; *Tex. Dep't of Assistive & Rehabilitative Servs. v. Howard*, 182 S.W.3d 393, 396 (Tex. App.—Austin 2005, pet. denied). A person whose employment is terminated in violation of section 554.002 may sue for injunctive relief, reinstatement, damages, and reasonable attorney's fees. Tex. Gov't Code Ann. § 554.003. The person must generally sue within ninety days of the improper employment action. *Id.* § 554.005.

---

[18]Under chapter 554, the "law" includes state and federal statutes, local ordinances, and rules adopted under statutes or ordinances. Tex. Gov't Code Ann. § 554.001(1). Because we hold below that appellees were entitled to summary judgment on an affirmative defense that is unrelated to whether appellant's reports were made in good faith, we will not address the issue of good faith. *See* Tex. R. App. P. 47.1.

20

Among other grounds, appellees sought summary judgment on the affirmative defense described by section 554.004(b) of the government code, which states,

> It is an affirmative defense to a suit under this chapter that the employing state or local governmental entity *would have taken* the action against the employee that forms the basis of the suit based solely on information, observation, or evidence that is not related to the *fact that the employee made a report* protected under this chapter of a violation of law.

*Id.* § 554.004(b) (emphasis added). Appellees argued in the trial court that appellant's "deceptive actions in the face of an official investigation would have inevitably caused a termination of his employment." In appellant's response to appellees' motion, he generally asserted that he could produce evidence of his claims and stated that he was "ultimately terminated for making the report of criminal violations against the Chief and other employees to the Tarrant County District Attorney," but he did not specifically respond to appellees' ground for summary judgment under section 554.004(b)'s affirmative defense.[19]

The affirmative defense in section 554.004(b), if proven, tends to negate the causation element of a plaintiff's claim because to show causation in a Whistleblower Act case, "a public employee must demonstrate that after he reported a violation of the law in good faith to an appropriate law enforcement authority, the employee suffered discriminatory conduct by his employer *that*

---

[19]Appellant also objected to much of appellees' summary judgment evidence, but appellant's issues on appeal do not attack the admissibility of appellees' evidence.

21

*would not have occurred when it did if the employee had not reported the illegal conduct.*"  *Hurley v. Tarrant Cnty.*, 232 S.W.3d 781, 786 (Tex. App.—Fort Worth 2007, no pet.) (emphasis added); *see City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 68 (Tex. 2000); *Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995) ("[T]he standard of causation in whistleblower and similar cases should be that the employee's protected conduct must be such that, without it, the employer's prohibited conduct would not have occurred when it did.").[20]  This causation standard has been described as a "but for" causal nexus requirement.  *Hurley*, 232 S.W.3d at 786 (citing *Rogers v. City of Fort Worth*, 89 S.W.3d 265, 280 (Tex. App.—Fort Worth 2002, no pet.)).

Typically, a causal link between the employee's report of illegal conduct and the adverse employment action may be established by circumstantial evidence, including knowledge of the report of illegal conduct, expression of a negative attitude toward the employee's report of the conduct, failure to adhere to established policies regarding employment decisions, discriminatory treatment of the reporting employee in comparison to similarly-situated employees, and evidence that the stated reason for the adverse employment action was false.  *Parsons*, 353 S.W.3d at 226 (citing *Zimlich*, 29 S.W.3d at 69); *Hurley*, 232

---

[20]Although the supreme court discussed the issue of causation in Whistleblower Act cases in *Zimlich* and in *Hinds*, the court did not discuss the effect of section 554.004(b)'s affirmative defense upon causation in either case because in both cases, the allegedly retaliatory employment action occurred before the effective date of section 554.004(b).  *See Zimlich*, 29 S.W.3d at 66–67; *Hinds*, 904 S.W.2d at 637.

S.W.3d at 786. On appeal, appellant relies on such evidence; he asserts, among

other facts, that

- during his investigation, Captain Daniels knew of appellant's reports of allegedly illegal conduct by SDPS employees to the district attorney; at the time of their successive termination decisions, Chief Goolsby, Blagg, and Yelverton also knew of appellant's involvement in making the reports; and Chief Goolsby, Blagg, and Yelverton were aware of the January 9 e-mail that appellant sent, which contained complaints against each of them;

- in their summary judgment affidavits, Yelverton, Blagg, Chief Goolsby, and Captain Daniels described appellant's anonymous January 9, 2008 e-mailed whistleblower report as a deceptive act, which implies that they viewed the report negatively; and Blagg's October 2007 e-mail exchange with appellant, in which Blagg said that appellant was "knit-picking," also shows that Blagg viewed whistleblower reports negatively;

- although Chief Goolsby usually did not discuss internal affairs investigations, he discussed appellant's investigation with other SDPS employees; and during Captain Daniels's investigation, Captain Daniels did not provide appellant with an opportunity to take a polygraph test concerning whether Watkins gave consent to use his name in the January 23, 2008 e-mail even though under a general order, Captain Daniels had the authority to do so; and

- by describing the January 9 e-mail as deceptive, Yelverton conceded that the anonymous whistleblower report itself was a cause of the termination decision; and although Captain Daniels, Chief Goolsby, and Blagg claim to have not known about appellant's report of misconduct to the district attorney, other facts show that they knew of the report, and their "conscious attempt to hide their knowledge . . . shows that the whistleblower report was a factor in their investigation and decision to terminate" appellant.[21]

---

[21]In the argument portion of appellant's summary judgment response in the trial court, he did not specify the facts that he now relies upon on appeal to defeat appellees' affirmative defense. "Generally, the nonmovant must expressly present to the trial court any reasons for avoiding the movant's right to summary judgment." *Bassett v. Am. Nat'l Bank*, 145 S.W.3d 692, 696 (Tex. App.—Fort Worth 2004, no pet.); *see also* Tex. R. Civ. P. 166a(c) (explaining that issues "not

It is possible that these facts amount to circumstantial evidence showing that appellant's reports of misconduct provided one basis for appellees' decision to fire appellant. Under the plain language of section 554.004(b),[22] however, appellees are nonetheless entitled to their affirmative defense if the decision to fire appellant *would have* been made solely on a basis that is independent of the fact of the reports. Tex. Gov't Code Ann. § 554.004(b). Appellant correctly notes that the Whistleblower Act does not require an employee to prove that the reporting of illegal conduct was the sole reason for the complained-of adverse employment action. *Hurley*, 232 S.W.3d at 786. Thus, if the employee's report would not have been enough by itself to cause the employer's adverse employment action but was an indispensible component, in combination with other facts, of the action, then the report caused the action under the Whistleblower Act. *See id.* If, however, the evidence conclusively establishes that any possible consideration by the employer of the fact that the employee made a report was only superfluous to the adverse employment action and that the action would have occurred regardless of the fact of the report, then section

---

expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal").

[22]*See Gray v. Nash*, 259 S.W.3d 286, 291 (Tex. App.—Fort Worth 2008, pet. denied) ("When construing a statute, our goal is to ascertain and give effect to the legislature's intent as expressed by the plain and common meaning of the statute's words.").

554.004(b)'s affirmative defense precludes liability. *See* Tex. Gov't Code Ann. § 554.004(b).

The supreme court demonstrated this principle in *Haggar Clothing Co. v. Hernandez*, in which the court examined causation under a statute that precludes retaliatory discharges and is therefore similar to the Whistleblower Act. 164 S.W.3d 386, 388 (Tex. 2005).[23] Hernandez was injured while working for Haggar as a seamstress. *Id.* at 387. After Hernandez did not return to work for more than a year following her injury, Haggar fired her under a leave-of-absence policy that provided that the "maximum amount of time an employee could remain on leave, regardless of the reason, was one year." *Id.* Hernandez sued Haggar, alleging that she had been fired for filing a workers' compensation claim after she had been injured, and although a jury rendered a verdict in her favor and a court of appeals affirmed the trial court's judgment on the verdict, the supreme court reversed on the ground of legal insufficiency. *Id.* That court explained,

> In affirming the trial court's judgment, the court of appeals focused heavily on evidence Hernandez presented that Haggar's safety-incentive policies, which included bonus opportunities for

---

[23]*Hernandez* concerned a claim under section 451.001 of the labor code, which states, in part, that a person may not discharge or discriminate against an employee because the employee has filed a workers' compensation claim in good faith. *Id.*; *see* Tex. Labor Code Ann. § 451.001(1) (West 2006). Plaintiffs in retaliatory discharge claims under section 451.001 may rely on the same types of circumstantial evidence of causation as plaintiffs in Whistleblower Act claims. *See Louis v. Mobil Chem. Co.*, 254 S.W.3d 602, 611 (Tex. App.—Beaumont 2008, pet. denied); *see also Cont'l Coffee Products Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996) (comparing the Whistleblower Act to section 451.001 and stating that the same principles of causation should apply to both statutes).

25

units that had accumulated a certain number of hours without a "lost-time accident" that required an employee to miss work, pressured employees not to report workplace injuries for fear of upsetting co-workers. Hernandez also presented evidence that plant managers were under economic pressure to minimize workers' compensation claims, that she had felt pressured to remain at work the day of her accident, and that [Haggar's plant manager] had threatened not to pay for her treatment by a chiropractor the day after the accident. *This may constitute circumstantial evidence supporting a causal link between Hernandez's termination and her filing a workers' compensation claim.* We held in *Cazarez*, however, that an employer who terminates an employee pursuant to the uniform enforcement of a reasonable absence-control provision will not be liable for retaliatory discharge. The above evidence *is thus immaterial* if Hernandez's termination was required by the uniform enforcement of Haggar's one-year leave-of-absence policy.

*Id.* at 388 (emphasis added) (citations omitted). Following *Hernandez*, courts of appeals, including our own court, have held that circumstantial evidence of retaliation is immaterial when an employer proves an independent basis for an adverse employment action. *See Parker v. Valerus Compression Servs., LP*, No. 01-10-00916-CV, 2011 WL 3918159, at *5–6 (Tex. App.—Houston [1st Dist.] Aug. 25, 2011, pet. denied) (stating that when an employer proves a uniform, independent basis for termination, the terminated employee "must provide competent evidence that the employer treated him differently from similarly situated employees in order to survive a summary judgment motion"); *Alonso v. Stanley Works, Inc.*, 111 S.W.3d 850, 851–52 (Tex. App.—Dallas 2003, no pet.); *see also Jackson v. FedEx Ground Package Sys., Inc.*, No. 02-07-00246-CV, 2008 WL 1867931, at *4–6 (Tex. App.—Fort Worth Apr. 24, 2008, no pet.) (mem. op.) (affirming a summary judgment in favor of an employer because the

26

employer's post-injury drug screening policy, which the employee did not comply with, comprised an independent ground for termination).

In his brief, appellant states that his termination was "centered on his sending of the January 23, 2008" e-mail, which he says was an attempt to preserve his anonymity. He concedes that the January 23 e-mail implied that Watkins wrote the January 9 e-mail. Regardless of whether Watkins gave appellant permission to associate Watkins's name with the January 23 e-mail (which is a disputed fact), appellant's statement in the January 23 e-mail that Watkins had written the January 9 e-mail was intentionally false; it was, as appellant admitted, an attempt to divert Captain Daniels's investigation.

An SDPS employee's violation of a general order may result in "counseling, reprimand, suspension, and/or dismissal." One general order states that a Southlake police officer should be "[h]onest in thought and deed in [the officer's] personal and official life." Another order states, "One of the standards of ethical conduct is truthfulness. Truthfulness is essential and expected when dealing with a single employee or the public." Yet another general order classifies untruthfulness as a "Class One Complaint" that must be investigated according to internal affairs procedures. Although SDPS's policy provides for differing levels of discipline, a general order states, "It is recognized that it may occasionally be necessary to dismiss an employee without progressing through any earlier disciplinary measures."

General Order 621.03 provides a "Discipline Decision Matrix" that lists ten possible infractions and the recommended discipline upon the first, second, and third occurrences of those infractions within a twelve-month period. For example, for a critical performance deficiency, the matrix recommends retraining, probation, or a reprimand for the first occurrence; probation or a suspension for the second occurrence; and a three-day suspension or termination for the third occurrence. For sexual harassment by inappropriate comments, the matrix recommends discipline ranging from verbal counseling to a three-day suspension for the first occurrence, a written reprimand to a three-day suspension for the second occurrence, and a three-day suspension to demotion or termination for the third occurrence. For untruthfulness, the matrix simply recommends termination for the first occurrence.

Yelverton made the ultimate decision to terminate appellant's employment with Southlake. Under authority from Texas courts, we must primarily consider the rationale of her decision in determining whether appellees rightfully prevailed on their affirmative defense. *See Harris Cnty. v. Vernagallo*, 181 S.W.3d 17, 26 n.15 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (declining to adopt the "conduit" theory, which permits liability when one supervisor makes a recommendation regarding an employee to another innocent supervisor who acts on that recommendation without conducting any independent judgment); *City of Fort Worth v. Johnson*, 105 S.W.3d 154, 169 (Tex. App.—Waco 2003, no pet.) ("The trial court's finding that Pete Nelson's negative attitude caused Johnson's

termination has no bearing on the outcome of this case. Nelson did not have the ultimate authority to either terminate or reinstate Johnson."); *see also Costello v. Bank of Am., N.A.*, No. 14-06-00195-CV, 2007 WL 4303499, at *4 (Tex. App.—Houston [14th Dist.] Dec. 11, 2007, no pet.) (mem. op.) ("Costello contends there is overwhelming evidence that Brugger expressed a negative attitude . . . . Brugger, however, was not the decision maker in Costello's termination.").[24]

Yelverton stated that she does not become involved in termination decisions until they reach her level of the appeal process. She explained, "I independently try to determine if the totality of the information supports or does not support the matters that are being appealed. . . . I become the final decision-maker under governing rules. . . ." In Yelverton's affidavit, she said,

> My focus was on Charge Nos. 10 and 11 . . . dealing with the use of the name Quentin Watkins by [appellant] in connection with the second January 23, 2008 email which also claimed credit for having sent the earlier January 9, 2008 email.
>
> . . . .
>
> . . . The key charges against [appellant] which were the basis for overruling his appeal were Charge Nos. 10 and 11 . . . . [Appellant] certainly knew that by sending an anonymous email . . . with a number of complaints and with sensitive and confidential

---

[24]Citing a United States Supreme Court case that concerned liability under a federal statute, appellant argues that a "review of the animus of all persons involved in investigating or terminating [appellant] is necessary to determine whether the good faith report was a cause of the retaliatory conduct." *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192–93 (2011). But even in that case, the Court recognized that if the employer's ultimate action is taken for "reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable." *Id.* at 1193.

29

information, there would certainly be an investigation conducted to determine the identity of the sender. Initially sending such an email in an anonymous fashion was deceptive. However, when [appellant] sent a second email January 23, 2008 claiming to [be] Quentin Watkins, this was yet another untruthful and deceptive act. . . .

. . . While certainly any employee in any business should be truthful as they carry out the business of their employer, it is particularly important for a Police Officer to be truthful. A Police Officer will regularly write reports involving charges or potential charges or investigations. . . . A Police Officer will be called upon to give testimony in various courts. . . . It is my understanding that under appropriate circumstances, in a criminal proceeding, a criminal defendant may have a right to be informed that an Officer has been found to be untruthful, and such information potentially can be used to impeach the Officer's credibility . . . . I was concerned that if [appellant] felt that he could bend the truth or be untruthful for purposes of a claim that he thought was righteous, this could carry over into his work as a Police Officer and supervisor. . . .

. . . [Southlake's charter] clearly provides that any employee or appointed official is required to be truthful . . . . Southlake General Order § 603.04 requires employees to be truthful . . . . The City's applicable disciplinary rules included in the General Orders manual indicate that a Police employee will be terminated for a first time offense involving untruthfulness . . . .

With that background, Yelverton stated, "A Police Officer who is not truthful and credible would be terminated for those reasons . . . *regardless of any other possible motivating factor*." [Emphasis added.] Yelverton explained that during the time that she has worked for Southlake (since 1993) she was not aware of any other police employee who was determined to be intentionally untruthful and was allowed to continue employment. In explaining the basis of her decision to terminate appellant's employment, Yelverton stated,

When I handled [appellant's] appeal and acted as the final decision-maker when I made my ruling . . . , I did not in any way retaliate

30

against [appellant] for engaging in whistleblowing. There is no doubt that [appellant] admitted that he sent an anonymous email and then later attempted to cover up his involvement in the anonymous email by using the name Quentin Watkins . . . . *Based on this deception and untruthfulness, I would have taken my actions involving [appellant] solely on this information or observation or evidence of deception and untruthfulness.* [Emphasis added.]

Chief Goolsby, who initiated appellant's termination, and Blagg, who initially upheld it, echoed Yelverton's sentiments about the determinative effect of appellant's untruthfulness upon his discipline. For example, Chief Goolsby stated in his affidavit,

[T]he most significant charges against [appellant] that . . . I thought should be sustained were the charges involving his untruthfulness . . . . I thought those charges were the most important because there was no doubt that [appellant] had been untruthful. . . .

. . . Additionally, when the initial administrative investigation was ongoing, [appellant] apparently realized he was likely to be identified as the anonymous sender. Therefore, instead of stepping forward to identify himself as the sender, he continued his untruthful deception by . . . pretend[ing] that Quentin Watkins had sent the first email and second email. . . .

. . . Even if Watkins did give permission to [appellant], I considered [appellant's] action of covering up the true sender to be deceptive and untruthful. . . .

. . . [A]n Officer's truthfulness and credibility are essential to the Officer's function as a Police Officer.

. . . A Police Officer who is not truthful and credible would be terminated for those reasons regardless of any other possible motivating factor.

. . . .

. . . In short, regardless of whether or not [appellant] could establish that he had whistleblower status, his admitted deception and untruthfulness would have resulted in his termination . . . .

31

Like Yelverton, Chief Goolsby stated that during the time he worked for Southlake (since 2005), he was not aware of any police employee who was charged with intentional untruthfulness, had that charge sustained, and was allowed to continue employment.

Blagg said in his affidavit that it

is particularly important for a Police Officer to be truthful. A Police Officer will regularly write reports involving charges or potential charges or investigations. A Police Officer will, from time to time, need to assist in preparing . . . sworn affidavits for purposes of obtaining warrants . . . . A Police Officer will be called upon to give testimony . . . . If a Police Officer is not truthful, then his coworkers and supervisors will question his credibility . . . . Courts and prosecutors may question the Officer's credibility if the Officer has been found to be untruthful. . . .

. . . A Police Officer who is not truthful and credible would be terminated for those reasons . . . regardless of any other possible motivating factor.

. . . .

. . . What was most relevant to my decision was the fact that [appellant] intended to deceive the Department and interfere with or prevent the Department from finding out the identity of the sender of the email.[25]

---

[25]Although upon appellees' objection, the trial court excluded deposition excerpts that appellant attached to his summary judgment response, we note that even if we were to consider those excerpts, they are consistent with the basis of appellees' affirmative defense. In a deposition taken in connection with a lawsuit that Lieutenant Kenny brought against Southlake, Blagg said that appellant was fired because he "sent an email to the Mayor and a member of the City Council alleging to be another retired police officer." Captain Daniels testified in a similar deposition that the issue that "ultimately got [appellant] terminated was a truthfulness issue because he identified himself as . . . being somebody else."

Captain Daniels agreed with this sentiment, stating in his affidavit that regardless of whether appellant "could establish that he had whistleblower status, his admitted deception and untruthfulness should have resulted in his termination." The evidence also demonstrates that people outside of Southlake's government viewed appellant's untruthfulness with the same seriousness that Yelverton, Blagg, Chief Goolsby, and Captain Daniels did; when appellant looked for jobs with other police agencies after his firing from Southlake, he was told that he would not be hired because he was fired for untruthfulness.

In his brief, appellant appears to concede that Yelverton "terminated [him] because he was untruthful when he sent the second email claiming to be retired Officer Watkins." Appellant argues, however, that appellees cannot establish their affirmative defense because "(1) the January 23, 2008 email is based on information, observation, and evidence related to the fact that [he] made a report; [and] (2) [appellees] cannot establish that the January 23, 2008 email is the sole reason for [his] termination." First, we disagree that the inevitable (according to appellees' affidavits) termination of appellant's employment for untruthful statements within the January 23 e-mail is related to the "fact that [appellant] made a report protected [under chapter 554 of the government code] of a violation of law." *See* Tex. Gov't Code Ann. § 554.004(b). Appellant's whistleblower report was complete and was effectively protected under chapter 554 at the time he sent the first, anonymous e-mail to Mayor Wambsganss and Councilmember Hill on January 9. From that time through January 23, he could

33

have done nothing (to therefore remain anonymous until, at some future point, he was asked about his role in sending the e-mail),[26] or he could have truthfully taken responsibility for the January 9 e-mail; instead, through the January 23 e-mail, he lied (either with or without Watkins's permission). The lie was not a component of appellant's making a report protected by chapter 554; rather, as appellant has conceded, it was a component of diverting the police department's investigation.

Second, we disagree with appellant that to be entitled to their affirmative defense, appellees must show that appellant's January 23 e-mail was the sole basis for his termination or that appellant's whistleblower reports were not a basis for the termination. Rather, under the facts of this case, section 554.004(b) required appellees to prove that disregarding any improper basis that they might have had for terminating appellant, they *would have* terminated him based on the proper basis of his untruthfulness. *See id.*; *Vela v. City of Houston*, 186 S.W.3d 49, 54–55 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (concluding that even assuming that the plaintiff's allegations concerning whistleblower retaliation were true, the city was entitled to summary judgment because it proved that it would have nonetheless disciplined the employee for falsifying records and violating city policies); *see also Hernandez*, 164 S.W.3d at 388–89 (explaining this rationale in

---

[26]Thus, we disagree with appellant that the effect of sustaining appellees' affirmative defense is to "subject all anonymous reporters to retaliatory treatment." Appellees' evidence demonstrates that appellant would have been fired apart from his initial anonymity because he lied.

the context of a workers' compensation retaliation claim). For this reason, as explained in *Hernandez*, appellant's circumstantial evidence of a possible retaliatory basis for his termination does not defeat appellees' entitlement to summary judgment because it does not cast doubt that Chief Goolsby, Blagg, and ultimately, and most importantly, Yelverton, would have fired him for his admitted untruthfulness; at most, the evidence shows that there might have been more than one ground on which appellees would have fired him.

Referring to Lieutenant Douglas (who did not have authority to decide appellant's discipline), appellant argues that the "only person not implicated by [his] reports recommended that he not be terminated." For two reasons, we cannot see the relevance of this fact to appellees' affirmative defense. First, although Lieutenant Douglas did not recommend that appellant be terminated, she did recommend that he be disciplined (by demotion and probation) on the basis that he was untruthful in the January 23 e-mail. Second, it is not imperative to appellees' affirmative defense that Southlake was required to fire appellant for untruthfulness or that every SDPS employee would have come to the same termination decision that Yelverton did. Instead, it is appellees' defense, based on the unambiguous, uncontroverted evidence they presented, that the decision makers in this case—Chief Goolsby, Blagg, and Yelverton—would have uniformly terminated him for untruthfulness regardless of any other factor.

In his brief, appellant relies in part on *Moreno v. Texas A & M Univ.-Kingsville*, 339 S.W.3d 902 (Tex. App.—Corpus Christi 2011, pet. filed). In that

35

case, Moreno, the university's comptroller, had been fired after she reported her belief that her supervisor had broken the law by improperly receiving an out-of-state tuition waiver for his daughter. *Id.* at 905. In its motion for summary judgment, the university

> produced evidence that [the supervisor] had other legitimate, non-retaliatory reasons for terminating Moreno's employment, including that Moreno: (1) was unable to complete specific and complicated budget-related tasks on her own; (2) did not provide budget reports to [the supervisor] in a timely manner after he requested them; (3) interfered with and delayed the hiring process for an engineer because she did not agree with the salary that [the supervisor] proposed for him; (4) failed to provide required information and services to other [university] departments in a timely manner; and (5) was generally uncooperative and difficult to work with. . . .
>
> *Moreno produced evidence, however, that these stated reasons for her termination were pretextual*.

*Id.* at 914 (emphasis added) (explaining that the university's reasons could have been pretextual because, in part, Moreno presented evidence that the university's provost believed her to be thorough, knowledgeable, ethical, and competent). We have not located evidence in this case that raises a genuine issue of material fact that casts doubt on Yelverton's statement that she would have fired appellant for untruthfulness apart from any other motivation. For example, we have not found evidence that Yelverton (or Chief Goolsby or Blagg) failed to fire someone who was similarly situated to appellant and who was found to be and admitted to be untruthful. *See Hernandez*, 164 S.W.3d at 389 (holding that there was no causation in a workers' compensation retaliation case because the plaintiff did not present more than a scintilla of evidence that the employer's

policy was not uniformly enforced or that the employer's explanation for the termination was false); *Parker*, 2011 WL 3918159, at *5 ("When an employer provides proof that it terminates an employee pursuant to a uniformly applied . . . policy, a terminated employee must provide competent evidence that the employer treated him differently from similarly situated employees in order to survive a summary judgment motion.").

Appellant compares his firing to the discipline faced by two other Southlake employees: Kevin Northcutt and Lieutenant Kenny. Yelverton's affidavit described that several years before appellant made his whistleblower complaints, Northcutt, who worked in Southlake's Public Works Department, made a whistleblower report about that department's wrongdoing. Yelverton said that Northcutt's whistleblowing led to extensive investigations by the city and precipitated the firing of a number of Southlake's employees. Because Northcutt was involved in the wrongdoing, he was suspended for a period of time, but he continued to be employed by the city for five years after that until he voluntarily resigned. We conclude that Northcutt's continued employment with Southlake does not raise a genuine issue of material fact that casts doubt on the reason for appellant's firing; Northcutt was not found to be untruthful, and he was not an employee of the police department.

Yelverton's affidavit also said of Lieutenant Kenny,

In one instance, former Police Lieutenant Michael Kenny had faced several internal charges, *and based on an initial determination that he had been untruthful*, his employment was terminated. During the

37

appeal process, I determined that Michael Kenny may have stated information incorrectly, but did not do so intentionally. Therefore, I decided *Kenny had not been untruthful*. Michael Kenny's employment was reinstated. [Emphasis added.]

Like Northcutt, Lieutenant Kenny is not similarly situated with appellant. Yelverton ultimately found Lieutenant Kenny to not be untruthful, and it is indisputable that appellant was untruthful when he wrote in the January 23 e-mail that Watkins had sent the January 9 e-mail. If anything, the evidence as to Lieutenant Kenny's initial discipline of termination for untruthfulness and subsequent reinstatement when he was found to not be untruthful supports appellees' affirmative defense that they would have fired appellant for deceptiveness and untruthfulness.[27]

For all of these reasons, based upon the summary judgment evidence that appellees presented and upon the lack of evidence by appellant to raise a genuine issue of material fact that he would not have been fired based on his untruthfulness, we conclude that appellees conclusively proved their entitlement to summary judgment on the affirmative defense of section 554.004(b), and we hold that the trial court did not err by granting appellees' motion for summary judgment and plea to the jurisdiction. *See* Tex. Gov't Code Ann. § 554.004(b); Tex. R. Civ. P. 166a(b), (c); *Lueck*, 290 S.W.3d at 883 (explaining that the

---

[27]We note that this evidence also seems to contradict appellant's claim that he was fired because he was a whistleblower. Appellant has noted that Lieutenant Kenny and Northcutt were also whistleblowers, and according to Yelverton, Lieutenant Kenny and Northcutt retained their employment with Southlake.

elements of a whistleblower claim may be considered to determine both jurisdiction and liability). We overrule appellant's second issue, and because that issue is dispositive of appellant's claim under the Whistleblower Act, we decline to address appellant's other issues.[28] *See* Tex. R. App. P. 47.1.

## Conclusion

Having overruled appellant's second issue, which is dispositive in his appeal, we affirm the trial court's judgment.


TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER and MCCOY, JJ.

MCCOY, J., concurs without opinion.

DELIVERED: May 31, 2012

---

[28]In his fourth issue, appellant contends that the trial court abused its discretion by excluding some of his summary judgment evidence upon appellees' objections. We have considered the summary judgment evidence specifically described within appellant's fourth issue, and we have determined that the evidence does not affect the resolution of appellant's second issue. Appellant's first and third issues discuss other grounds upon which the trial court might have granted appellees' summary judgment motion.

39