## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-60072

United States Court of Appeals
Fifth Circuit

**FILED**

June 29, 2018

Lyle W. Cayce
Clerk

KYMBERLI GARDNER,

Plaintiff - Appellant

v.

CLC OF PASCAGOULA, L.L.C., doing business as Plaza Community Living Center,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before KING, DENNIS, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

Claims of sexual harassment typically involve the behavior of fellow employees. But not always. Because the ultimate focus of Title VII liability is on the employer's conduct—unless a supervisor is the harasser, a plaintiff needs to show that the employer knew or should have known about the hostile work environment yet allowed it to persist, *see Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998))[1]—nonemployees can be the source of the harassment. *See* 29 C.F.R.

---

[1] Even when a supervisor is the harasser, liability flows from agency principles that render the employer liable. *Vance*, 570 U.S. at 428–29. One of those situations is when a supervisor's harassing behavior resulted in an adverse "tangible employment decision." *Id.*

## No. 17-60072

§ 1604.11(e) ("An employer may . . . be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action.").

Customers are one example of third-party harassers. *See generally* Lori A. Tetreault, *Liability of Employer, Under Title VII of Civil Rights Act of 1964 (42 U.S.C.A. §§ 2000e et seq.) for Sexual Harassment of Employee by Customer, Client, or Patron*, 163 A.L.R. FED. 445 (2000). A leading case on third-party harassment addressed whether Pizza Hut could be liable for customers' harassment of a waitress. *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1067, 1072 (10th Cir. 1998). Casinos seem especially susceptible to these claims, as one case addresses a high roller's harassment of a cocktail waitress and another a card player's harassment of a blackjack dealer. *See generally Oliver v. Sheraton Tunica Corp.*, 2000 WL 303444 (N.D. Miss. Mar. 8, 2000) (former); *Powell v. Las Vegas Hilton Corp.*, 841 F. Supp. 1024 (D. Nev. 1992) (latter).

This case presents one of the more challenging situations in which to apply this principle that an employer can be liable for a hostile work environment created by nonemployees: a nurse alleges that an assisted living facility allowed such an environment to continue by not preventing a resident's repetitive harassment. The unique nature of that workplace is an important consideration. As we and other courts have recognized, the diminished

---

Liability attaches in that situation because that injury "requires an official act of the enterprise" that will usually be "documented in official company records" and often "subject to review by higher level supervisors." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–62 (1998). Absent that type of employment consequence, the company will be liable for a supervisor's harassment only "if the employer is unable to establish an affirmative defense" that considers whether the employer took preventative or corrective measures to combat the harassment. *Vance*, 570 U.S. at 429–30 (citing *Ellerth* and *Faragher*).

## No. 17-60072

capacity of patients influences whether the harassment should be perceived as affecting the terms and conditions of employment. We must decide when the allegations of harassment nonetheless become so severe or pervasive, and the lack of corrective action so glaring, that fact issues exist requiring a jury to decide the case.

## I.

Kymberli Gardner worked as a Certified Nursing Assistant at an assisted living facility operated by CLC of Pascagoula, d/b/a Plaza Community Living Center, from 2012 until she was fired in 2015.[2]  Gardner is an experienced health aide.  Before working for CLC, she was a caregiver for several facilities and in-home care providers, two of which specialized in care for the mentally disabled.  Gardner was trained in defensive and de-escalation tactics for aggressive patients.  As one might expect, during her years as a caregiver she often worked with patients who were "either physically combative or sexually aggressive."

But what she experienced with one patient at the CLC facility rose to a new level.  J.S. was an elderly resident who lived at Plaza between 2006 and 2014.  He had a reputation for groping female employees and becoming physically aggressive when reprimanded.  J.S. had been diagnosed with a variety of physical and mental illnesses including dementia, traumatic brain injury, personality disorder with aggressive behavior, and Parkinson's Disease.  J.S.'s long history of violent and sexual behavior toward both patients and staff included the following:

- J.S. had to be transferred from his initial residence wing because he had become "combative" and had physically assaulted his bedridden roommate during a dispute over a television.

---

[2] In light of the summary judgment posture, we recite these facts taking competing evidence in the light most favorable to Gardner.

- J.S. was much more aggressive and sexually inappropriate towards his female caregivers than even other problematic nursing home residents; he would sexually assault them by grabbing their "breast[s], butts, thighs, and try[ing] to grab [their] private areas."
- J.S. asked for explicit sexual acts on a regular basis and made lewd sexual comments toward female staff. He asked female employees to engage in sexual activity with him "[a]ll the time."

Gardner, who became responsible for J.S.'s care, experienced these types of inappropriate behavior from J.S. "[e]very day." Gardner reported that J.S. would physically grab her and make repeated sexual comments and requests. She and other CLC employees documented J.S.'s behavior by routinely recording it on his chart and making complaints to supervisors.

As a result, J.S.'s behavior was not a secret to those who ran the assisted living facility. Brandy Gregg, Gardner's former supervisor and now the director of nursing, had witnessed J.S.'s behaving in a sexually inappropriate manner and also received complaints from nurses to that effect. These concerns led administrators to transfer J.S. to a new wing. But they were not always responsive to the complaints. They declined, for example, to have him undergo a psychiatric evaluation after he assaulted his roommate. J.S. later assaulted a CLC employee and was sent for evaluation, but subsequently returned to CLC. And when Gardner attempted to discuss her concerns about J.S.'s behavior, Gregg laughed, and Administrator Teri Reynolds told Gardner to "put [her] big girl panties on and go back to work."

So Gardner continued to care for J.S., which ultimately resulted in the incident that led to her termination. It began when Gardner was trying to help J.S. attend a therapy session. As she was assisting J.S. out of bed, he began trying "to grope" her and then tried to touch Gardner's left breast while she was bent over. When she tried to move out of the way, J.S. punched her on the side of her breast. Gardner then laid him down on the bed and left the room to get help. Janice Watkins, another nursing assistant, joined Gardner and

the two again attempted to help J.S. out of bed and into a chair. At this point J.S. punched Gardner a second time. Gardner removed herself from J.S's immediate area at which point he began to grab Watkins' "private area." Gardner sought help from the nurse on duty, Judy Toche. Gardner, Toche, and Watkins were able to get J.S. into his wheelchair. Gardner then moved to make the bed, but J.S. punched her a third time.

What Gardner did in response is disputed. Gregg's typed summary of events, as well as the deposition testimony of Toche, and Toche's "nurse's notes" from the day of the incident claim that Gardner "swung her own fist over [J.S.'s] head" and that her arm "brushed the top of his head." Watkins, on the other hand, asserts in both her deposition and her written witness interview statement that Gardner "[went] up with her hand as if she was going to hit [patient]" but "didn't hit [patient] at all." Gardner says she did not swing at J.S. during the incident. Gardner also reportedly made two statements as she was leaving J.S.'s room. Watkins testifies Gardner said, "I am not doing shit else for [patient] at all." Gardner also reportedly said, "I guess I'm not the right color," presumably because Toche, a white nurse, was able to calm J.S. whereas Gardner, a black nursing assistant, could not. After the incident, Gardner spoke with both Toche and Terri Reynolds, then the facility administrator, about her assignment to care for J.S. Gardner refused to care for him due to the continued harassment and asked to be reassigned. Her request was denied.

Gardner then left work and went to the emergency room that evening due to injuries she sustained. She did not return to work for three months during which time she received workers' compensation.[3]     Shortly after

---

[3] Gregg and the contemporaneous incident report say that Gardner had been suspended. But the report from CLC's internal investigation contradicts that claim as it says that Gardner's "separation from her employment was held pending her completion of her

No. 17-60072

returning from leave, Gardner was fired.  Gregg, Gardner's supervisor at the time, says Gardner was fired for three reasons: (1) insubordination (refusing to care for J.S.); (2) violating J.S.'s resident rights (by swearing in front of him and making a "racist type statement[]," apparently the one about her not being the "right color"); and (3) attacking J.S. (swinging over his head).

As for J.S., nothing happened to him as a result of the incident with Gardner.  But another altercation later that same day with a resident resulted in his being sent for a psychiatric evaluation and then moved to an all-male "lockdown" unit in nearby Biloxi.

Gardner sued, asserting multiple claims under Title VII.  CLC moved for summary judgment and to strike certain affidavit testimony.  Gardner also moved to strike portions of affidavit and deposition testimony.  The district court denied Gardner's motion to strike, and denied in part and granted in part CLC's motion to strike.[4]  The lower court then granted summary judgment in favor of CLC on all claims.  Gardner's appeal pursues only her claims of hostile work environment and retaliation.[5]

## II.

The district court concluded that a hostile workplace did not exist.  It explained that it was "not clear to the Court that the harassing comments and

workmen's compensation."  Gardner's affidavit also asserts she was never informed she had been suspended.  We assume for purposes of summary judgment that Gardner was not suspended and was on workers' compensation during her three-month absence.

[4] Gardner appeals some of those evidentiary rulings.  We conclude that the district court did not abuse its discretion striking portions of her affidavit as speculative.  And we need not decide whether the district court erred in considering Gregg's testimony about the reasons for the termination.  Gardner argues Gregg was not involved in that personnel decision so lacked sufficient knowledge.  But we conclude that the retaliation claim should get past summary judgment even considering Gregg's testimony that the district court allowed.

[5] While Gardner purports to appeal her sex discrimination claim based on disparate treatment in addition to the one alleging hostile work environment, she has not sufficiently briefed that claim.

No. 17-60072

attempts to grope and hit are beyond what a person in Gardner's position should expect of patients in a nursing home." CLC defends the grant of summary judgment on that ground as well as on one the district court did not reach: whether the company knew about the harassment and failed to take remedial action. The other elements of a Title VII hostile work environment claim—that Gardner is a member of a protected class who was subject to some harassment on the basis of her sex—are not disputed. *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 401 (5th Cir. 2013).

## A.

Our de novo review of the grant of summary judgment leads us to a different conclusion given that all inferences must be viewed in Gardner's favor at this stage. *See Williams v. Hampton*, 797 F.3d 276, 282 (5th Cir. 2015); *Burnett Ranches, Ltd. v. United States*, 753 F.3d 143, 146 (5th Cir. 2014). To get past summary judgment, Gardner need not make it "clear" that she was subject to actionable harassment; she of course only needs to show that a jury could reach that conclusion based on its view of the evidence.

Title VII does not prohibit all harassment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). It makes harassing conduct unlawful when it results in the employer "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23 (1993); *Meritor*, 477 U.S. at 64–67. This statutory language "is not limited to 'economic' or 'tangible' discrimination." *Id.* at 64. Instead, "the phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 64). Title

7

VII is violated "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Id.*; *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999). The Supreme Court set the "severe or pervasive" standard as a "middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Harris*, 510 U.S. at 21. A plaintiff "must subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable." *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003).

As a starting point, the multiple years of unwanted sexual grabbing and explicit comments Gardner endured could certainly be deemed severe and pervasive harassment—only one of those is necessary, *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 163 (5th Cir. 2007)—if the harasser were someone without any mental impairments. *Cherry v. Shaw Coastal, Inc.*, 668 F.3d 182, 189 (5th Cir. 2012) (hostile work environment when plaintiff was subject to multiple months of unwanted sexual grabbing and explicit comments); *Harvill, v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 435 (5th Cir. 2005) (finding severe or pervasive harassment when, over seven months, a coworker grabbed a female employee, fondled her breasts and patted her buttocks "numerous times," and rubbed his body against the plaintiff).

The complication is the one we have already mentioned: the source of the harassment is the resident of an assisted living facility who suffers from dementia. We have twice confronted hostile work environment claims based on the behavior of patients towards caregivers. The first case involved home health services. We held that the verbal harassment, which included the patient repeatedly propositioning the plaintiff for sex and calling her

disparaging names, was not sufficiently severe or pervasive. *Cain v. Blackwell*, 246 F.3d 758, 760–61 (5th Cir. 2001). We reached the same conclusion in the next case when a nursing home patient repeatedly directed racial slurs at a nurse's assistant. *E.E.O.C. v. Nexion Health at Broadway, Inc.*, 199 F. App'x 351, 353 (5th Cir. 2006).[6] Although the verbal harassment was "quite offensive," the comments did not rise to the level of actionable conduct because they were not "physically threatening or humiliating" and did not "pervade the work experience of a reasonable nursing home employee, especially considering their source." *Id.* at 353–54. We recognized, however, that there is not a categorical bar on hostile environment claims arising from harassment by patients. *See id.* at 353 ("*Cain* does not establish a bright-line rule that employees who care for disabled, elderly patients can never succeed on a Title VII claim.").[7] The "specific circumstances" of such claims "must be judged to determine whether a reasonable person would find the work environment hostile or abusive" taking due account of the "unique circumstances involved in caring for mentally diseased elderly patients." *Id.*

Other circuits have found triable hostile work environment claims when patients engaged in the physical harassment absent in *Nexion* and *Cain*. The Eighth Circuit reversed a grant of summary judgment when a mentally handicapped, teenage resident of a care facility "pushed [a female caregiver] against a door, forced her right hand above her head, pulled open her jeans and

---

[6] Although *Nexion* is not binding, we address it because the district court relied on it in granting summary judgment, and it illustrates the range of conduct courts have considered in this area.

[7] The district court thought *Nexion* "indicates that the default is no viable Title VII claim in such situations." *Nexion* did not create a default presumption against Title VII liability when the harasser is suffering from mental disability. Its statement that there is no "bright-line rule" does the opposite of setting any hard and fast rule. The *Nexion* language emphasizes what is true of most areas of the law—the outcome will depend on the facts of individual cases. So while a diminished mental condition of the harasser is an important consideration, it does not preclude liability.

her blouse, grabbed her left breast, and pushed his weight and erect penis against her stomach." *Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1108 (8th Cir. 1997). The Tenth Circuit also rejected a district court's granting judgment as a matter of law for the hospital when a patient "knocked [a psychologist] to the ground, undressed her and digitally penetrated her, bit and choked her, and repeatedly threatened to kill her." *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1242–43 (10th Cir. 2001).

J.S.'s conduct is more severe than the nonphysical harassment held to be insufficient in *Cain* and *Nexion*[8] but not as severe as the potentially life-threatening sexual assaults in *Crist* or *Turnbull*. But the latter situation does not set a floor for actionable conduct. *Harris*, 510 U.S. at 22 (explaining that Title VII does not require harassment to "seriously affect employees' psychological well-being"). So the question remains whether the conduct here, which falls in the middle of this continuum, is enough. And that, as we have said, involves the difficult line-drawing problem of what separates legally actionable harassment from conduct that one should reasonably expect when assisting people suffering from dementia.

Some principles can be gleaned from the caselaw about how hostile workplace law should account for a situation when individuals cannot medically conform their conduct to societal norms. Inappropriate comments and incidental contact are sufficiently common behaviors among patients with reduced cognitive ability that it is not objectively reasonable for a caregiver to

---

[8] It is also more severe and pervasive than the conduct in an Illinois federal case the district court relied on. *Pickett v. Sheridan Health Care Ctr.*, 2008 WL 719224, at *4 (N.D. Ill. Mar. 14, 2008), *aff'd*, 610 F.3d 434 (7th Cir. 2010). *Pickett* considered conduct from a resident that happened three times over eight months. More importantly, *Pickett* refrained from deciding whether the conduct was severe or pervasive, and instead granted summary judgment in favor of the defendant because it took several steps to mitigate the harassing behavior. *Id.* at *5. As will be discussed, CLC did not take those measures.

expect they will never happen. In contrast, the facility must take steps to try to protect an employee once there is physical contact that progresses from occasional inappropriate touching or minor slapping to persistent sexual harassment or violence with the risk of significant physical harm.

A jury could find such a situation here. The frequency and nature of the conduct, along with its effect on Gardner's employment, are sufficient to allow a finding that a reasonable caregiver on the receiving end of the harassment would have viewed it as sufficiently severe or pervasive even considering the medical condition of the harasser. *Id.* at 23 (finding that "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance" are factors that influence whether harassment can be described as "hostile" or "abusive"); *see also Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 347–48 (5th Cir. 2007). J.S.'s inappropriate conduct occurred daily. His conduct was far more severe than other residents' and consisted of physical sexual assault and violent outbursts. J.S.'s physical assault on Gardner took his behavior outside the realm of a "mere offensive utterance." And his actions interfered with her work performance, leaving Gardner unable to work for three months. A jury could conclude that an objectively reasonable caregiver would not expect a patient to grope her daily, injure her so badly she could not work for three months, and have her complaints met with laughter and dismissal by the administration. *Cf. Aguiar v. Bartlesville Care Ctr.*, 2011 WL 1461541, at *5 (10th Cir. Apr. 18, 2011) (finding sufficient severity when a patient repeatedly engaged in unwanted touching of a nurse assistant, "interfered with her work, and eventually assaulted her" with a medicine cart).

No. 17-60072

B.

That final feature—supervisors' mocking Garner when she raised complaints rather than trying to improve the situation—brings up an important point. A finding that a patient's harassment rises to a level of severity or pervasiveness that affects the terms and conditions of employment does not alone render the nursing home liable. That liability for a hostile workplace claim based on the behavior of someone other than a supervisor ultimately depends on whether the employer knew or should have known of the hostile work environment and took reasonable measures to try to abate it. *Royal*, 736 F.3d at 401. CLC argues that Gardner's inability to meet this final requirement also dooms her claim. Although the district court never reached it, we will consider whether it is an alternative basis for dismissing the case before it reaches a jury.

The answer to this question is more clear cut than the one we just resolved. The administration knew of the harassment. CLC does not dispute that it was aware of J.S.'s treatment of his caregivers, and multiple people testified that they reported his behavior to management. The company had prior notice not only because of informal complaints but also because of the daily written notes made by the staff.

In response to these concerns, CLC failed to even attempt to remedy the situation. Gregg reportedly laughed at Gardner when she complained about J.S.'s behavior, and there is no evidence that the administration took steps to protect its employees. After being punched three times, Gardner asked to be reassigned; the response was "no."

CLC emphasized in its brief that a nursing home is a unique environment and J.S.'s various illnesses made it impossible to control his actions. But CLC was not helpless in trying to mitigate his behavior. Other nursing homes have successfully avoided liability by taking steps such as

12

assigning a security escort, reassigning the victimized employee, and offering to remove the patient from the facility. *See Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 437–38 (7th Cir. 2010); *see also Crist*, 122 F.3d at 1112 (finding that defendant nursing home "controlled the environment" in which a violent patient resided and thus "had the ability to alter those conditions to a substantial degree"). Gardner testified about procedures enacted by other facilities where she had worked in the past, such as: requiring two or more caregivers at a time, using medication to control behavior, or transferring a problematic patient to a more appropriate home. Most telling of CLC's ability to remedy the situation is that it eventually removed J.S. and sent him to an all-male facility it operates. But it chose to do that only after J.S. assaulted another patient. No reason is given for why that option was not considered when female employees complained of pervasive harassment or in response to the severe assault of an employee.

There may be situations in which no measures can prevent an ill patient's physically aggressive behavior so the nursing home is put to the difficult choice of either evicting the patient from its care or allowing the harassment of its employees to continue. We need not decide the legal implications of that problem because this case does not present it. CLC did not undertake measures to try to remedy the harassment. This violated its duty to take reasonable steps to protect its employees once it knows that they are subject to abusive behavior. That obligation to at least try to protect employees exists even in the most challenging environments for controlling behavior, such as prisons. *See Freitag v. Ayers*, 468 F.3d 528, 539 (9th Cir. 2006) ("[E]ven in an inherently dangerous working environment, the focus remains on whether the employer took reasonable measures to make the workplace as safe as possible."); *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 677 (6th Cir. 2000) ("[The] general rule against prison liability for inmate conduct does not

No. 17-60072

apply when the institution fails to take appropriate steps to remedy or prevent illegal inmate behavior."). Gardner's hostile work environment claim can proceed to trial.

III.

Gardner has also shown that her retaliation claim may be entitled to reach a jury. To establish a claim of retaliation, Gardner must show "(1) she engaged in activity protected under Title VII, (2) an adverse employment action occurred, and (3) there was a causal connection between her protected activity and the adverse employment decision." *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir. 1992).

The district court analyzed the retaliation issue under the *McDonnell-Douglas* burden shifting framework used for cases relying on circumstantial evidence. But Gardner's argument all along has been that she can prove retaliation via direct evidence. Gregg's contemporaneous summary of that day's events, her later explanation for the firing, and Gardner's testimony about what she was told all refer to either Gardner's "insubordination" or her "refusal to provide J.S. care"—that latter apparently being at least part of what was viewed as the former—as the misconduct leading to her termination. That refusal to continue treating J.S. is what Gardner alleges is the protected activity of opposing an unlawful employment practice. *See E.E.O.C. v. Rite Way Serv., Inc.*, 819 F.3d 235, 237 (5th Cir. 2016). So at a minimum there is a triable issue on the "but for" causation element for retaliation claims that the district court thought was lacking. *See Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 648 (6th Cir. 2015) (finding direct evidence of retaliation when employer specifically references employees allegedly protected statements as examples of insubordination).

We note that there is a body of caselaw addressing when a refusal to engage in work that the plaintiff believes is subjecting her to unlawful conduct

14

qualifies as protected activity. Lex K. Larson, LARSON ON EMPLOYMENT DISCRIMINATION § 34.03 (2018) ("[S]elf-help activities, such as defying an employer's order, refusing to report to work, boycotting, or picketing the employer's plant to protest race or sex discrimination have at times been held to be opposition protected by § 704. Yet when such activities become too disruptive or violent, or when they violate the employees' contract provisions, courts are more apt to find them outside the bounds of that section."); *Smith v. Texas Dep't of Water Res.*, 818 F.2d 363, 365 (5th Cir. 1987) (holding the opposition clause of Title VII did not protect a female engineer who refused to perform temporary secretarial work that was not requested of men in her position); *see also Porta v. Rollins Envtl. Servs. (NJ), Inc.*, 654 F. Supp. 1275, 1284 (D.N.J. 1987), *aff'd without op.*, 845 F.2d 1014 (3d Cir. 1988) (denying defendant's motion for summary judgment on retaliation claim when plaintiff was fired for refusing to work certain shifts with sexually harassing supervisor). The district court did not grant summary judgment on the protected activity element, nor does CLC urge it as an alternative ground for affirming. We decline to pass judgment on this question without the benefit of briefing and leave it for resolution on remand.

\* \* \*

The judgment is REVERSED and the case is REMANDED for further proceedings.