# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-51126

United States Court of Appeals
Fifth Circuit

**FILED**

December 27, 2018

Lyle W. Cayce
Clerk

JENNIFER CRAMPTON,

        Plaintiff - Appellant

v.

JON WEIZENBAUM, in his individual capacity; SYLVIA RODRIGUEZ, in her individual and official capacity; TEXAS HEALTH AND HUMAN SERVICES COMMISSION, COURTNEY N. PHILLIPS, in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission,

        Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:16-CV-959

Before STEWART, Chief Judge, KING and OWEN, Circuit Judges.

PER CURIAM:[*]

This lawsuit is the epilogue to Jennifer Crampton's tumultuous 16-month employment at the Texas Department of Aging and Disability Services. Crampton alleges the defendants terminated her because she reported her supervisor's illegal activity in violation of the Texas Whistleblower Act, the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-51126

First Amendment of the United States Constitution, and Article 1, § 8 of the Texas Constitution. The district court granted summary judgment for the defendants on all claims. Crampton appeals. For the reasons explained below, we AFFIRM.

## I.

Plaintiff Jennifer Crampton is a former employee of the now-defunct Texas Department of Aging and Disability Services ("DADS"), which was charged with licensing home-healthcare agencies.[1] Crampton's job responsibilities included reviewing the licenses DADS issued to ensure the information on the licenses matched the information on the home-healthcare agencies' applications.

DADS hired Crampton in December 2014. The first few months of Crampton's employment were uneventful, but signs of the storm to come appeared in April 2015. At that point, Crampton began having difficulty getting along with a coworker, Olivia Williams. The problems appeared to stem, at least in part, from Crampton finding excessive errors in Williams's work. Mary Jo Grassmuck, Crampton's supervisor at the time, met with Crampton and Williams and encouraged them to improve their relationship.

About six weeks later, Grassmuck gave Crampton an all-around positive performance evaluation. She rated Crampton "Competent" or "Commendable" in every category and "Commendable" overall. And despite her prior issues with Williams, Grassmuck rated Crampton "Commendable" in both

---

[1] DADS was abolished in reorganization and subsumed into the Texas Health and Human Services Commission ("HHSC") on September 1, 2017. *See* Tex. Gov't Code § 531.0202. HHSC is therefore substituted as a party. *See* Fed. R. App. P. 43(c). Similarly, defendant Jon Weizenbaum retired upon the dissolution of DADS. His responsibilities are now executed by current HHSC Executive Commissioner Courtney N. Phillips. Accordingly, Phillips is substituted for Weizenbaum in his official capacity. *See id.* Weizenbaum remains a defendant in his individual capacity.

No. 17-51126

"Communication Skills" and "Professionalism." Further, Grassmuck wrote that Crampton "[i]nteracts with coworkers in a positive manner."

Grassmuck retired shortly after giving Crampton her performance evaluation. Defendant Sylvia Rodriguez took over as Crampton's immediate supervisor. On July 22, 2015, Rodriguez, Crampton, and Cindy Bourland, who sat two rungs above Rodriguez on the DADS organizational chart, met to discuss several issues Crampton was having at work. They spoke to Crampton about continued friction between her and Williams as well as "various complaints" that had been lodged against Crampton. Among examples of the latter were "a 'shouting match,' picking up others' documents off the printer, going into others' cubicles, and insensitive language." Bourland further reprimanded Crampton for behaving disrespectfully towards Rodriguez. And she told Crampton not to work unapproved overtime.

On September 14, 2015, Rodriguez announced a policy change regarding the procedures for processing home-healthcare agencies' requests to change management personnel. Texas regulations prescribe minimum academic qualifications for individuals holding certain management positions within licensed home-healthcare agencies. *See* 40 Tex. Admin. Code § 18.11. DADS's prior policy required home-healthcare agencies to demonstrate their managers' qualifications by sending the managers' resumes with the agencies' application requests. Rodriguez announced to her staff that, as a new internal policy, DADS would no longer require resumes to process change-of-management requests.

Crampton testified that she saw Rodriguez's new policy as being incompatible with DADS's responsibility to ensure that home-healthcare agencies were run by properly credentialed managers. Sometime over the next several weeks, Crampton began complaining about Rodriguez's change to the resume policy to various officials both inside and outside of DADS. Crampton

3

sent these officials the same 57-page packet of material, which included a cover letter, various emails discussing the policy change, and the regulations that, according to Crampton's interpretation, required DADS to check resumes before processing change-of-management requests. In her deposition, Crampton estimated that she sent these packets to about 40 or 50 different offices and officials.[2] The recipients included the Office of the Governor, the Office of the Attorney General, and numerous legislators. Crampton also testified that she spoke with various officials on the phone contemporaneously with mailing the packets.

Crampton testified that around that same time, a coworker asked for Crampton's assistance recreating supposedly missing copies of license-renewal letters—at Rodriguez's direction—that Grassmuck had sent prior to her retirement. To do so, Crampton would have needed to backdate the letters and forge Grassmuck's signature. Crampton said she refused to help because she believed that recreating the letters amounted to fraud.

Meanwhile, on October 20, 2015, Bourland, Rodriguez, and two other DADS officials began to discuss taking disciplinary action against Crampton. On November 3, Bourland proposed issuing Crampton a "second-level reminder" because of her continuous unprofessional and disruptive behavior.[3] Rodriguez prepared a memorandum to Crampton discussing the second-level reminder, which listed about a dozen separate incidents since the July 22 meeting in which Crampton had behaved disrespectfully towards a coworker or supervisor.

---

[2] The record does not reflect the identity of each recipient. Only one packet is included in the record, and it does not indicate to whom Crampton sent it. Crampton was unable to recall everyone she sent a packet to in her deposition.

[3] DADS's progressive-discipline policy prescribes three levels of "reminders" prior to termination for cause.

No. 17-51126

In the memorandum, Rodriguez detailed a wide range of inappropriate conduct. Recounting one incident, Rodriguez wrote, "On 9/22/15, I received an email from Julie Cox, a DADS employee from one of our sister units. She asked me if I was your manager. She reported that you were making fun of her and taunting her for wearing a hat. Your behavior was not acceptable." Rodriguez recounted a separate incident, which took place about a week after Crampton learned she had not been selected to interview for a promotion:

> On 9/24/15 or 9/25/15, you entered Licensing and Certification manager Bobby Schmidt's office without knocking and closed the door. Bobby stated that you appeared very upset. He said you commented on the interview screening process, how those employees who were interviewed were chosen, your qualifications and experience and why you were not chosen. Bobby observed you to use a loud and intimidating voice. He asked you to lower your voice several times, but you refused. You walked away without allowing Bobby an opportunity to respond. This type of behavior was inappropriate, unprofessional and is considered insubordination. Your communication with Bobby was poor.

These incidents are representative of Crampton's other behavior discussed in the memorandum. Rodriguez also reprimanded Crampton in the memorandum for continuing to work unapproved hours. The memorandum made no mention of any of Crampton's complaints about the resume policy, the alleged forgery, or related matters.

Bourland and Rodriguez met with Crampton on November 9 to discuss the second-level reminder. Internal emails show that Bourland reported to two HR representatives that, during the meeting, Crampton "continued to display many of the behaviors for which she was receiving the [second] level reminder," such as giving "sarcastic and inappropriate" answers. Remarking that she had "never experienced this exact type of response from an employee before," Bourland contemplated proceeding immediately to further discipline against Crampton, but she ultimately decided against it.

5

After receiving the second-level reminder, Crampton continued to correspond with various offices and officials about the perceived problems with the licensing unit. She also began alleging—including in a report to the Office of the Inspector General for the Texas Health and Human Services Commission ("OIG")—that she received the second-level reminder in retaliation for her whistleblowing.

On March 23, 2016, Rodriguez decided to take further disciplinary action because Crampton's behavioral issues continued unabated. Rodriguez issued Crampton a third-level reminder on March 28. In the third-level reminder memorandum, Rodriguez listed about a dozen additional incidents in which Crampton acted unprofessionally, worked unapproved overtime, or otherwise violated policy. All these incidents took place after Crampton received the second-level reminder. For example, in discussing one representative incident, Rodriguez wrote:

> February 12, 2016 – You came into my office to discuss the DADS approved training organization list; you became frustrated when I didn't agree with you that an assignment to you should have been assigned to another staff member and stated "I'm done here. You call me when you are ready to discuss this." You turned and started to leave my office. I responded that we were not done here and reminded you that this was the type of behavior that led to your Second Level Reminder. You displayed inappropriate, disrespectful, and unprofessional behavior.

Rodriguez and Robbi Craig, an HR representative, met with Crampton to discuss the third-level reminder with her. Crampton was again combative during this meeting: she repeatedly interrupted Rodriguez, "laughed aloud" while Rodriguez was reading from the memorandum, and tried to walk out of the meeting twice before its conclusion. The next day, Crampton submitted new information to the OIG, prompting it to reopen its investigation into her allegations, which it had previously closed.

No. 17-51126

As part of the third-level reminder, Crampton was given paid time off to reflect upon whether she wanted to continue working at DADS. Upon her return to work on April 1, Rodriguez and Craig met with Crampton to discuss her decision. During this meeting, which Rodriguez recorded, Crampton combatively denied any wrongdoing, alleged that all the discipline taken against her was retaliatory, repeatedly attempted to shift the subject to other employees' various malfeasance, and called Rodriguez a "sleaze."[4] Following that meeting, Rodriguez and Craig met with several other DADS officials to discuss Crampton, and Rodriguez decided to proceed towards termination. Rodriguez sent Crampton a notice of possible disciplinary action on April 7, which repeated the allegations in the third-level reminder memorandum and discussed Crampton's behavior at the March 28 and April 1 meetings. After reviewing Crampton's response, Rodriguez sent Crampton a termination letter on April 15.

---

[4] The following exchange is an illustrative example of the meeting:

     Ms. Craig: Respond to Sylvia [Rodriguez] positively and cooperatively when given guidance direction.
     Ms. Crampton: Oh, I would love to. That's again, Sylvia, what do you want? What else do you want, Sylvia? That was nice, kind, "yes."
     Ms. Rodriguez: You are being very disrespectful.
     Ms. Crampton: That's not disrespectful.
     Ms. Rodriguez: That is disrespectful.
     Ms. Crampton: No.
     Ms. Craig: I would suggest going forward that your second level manager be present or another manager be present for your private meetings.
     Ms. Crampton: Me too.
     Ms. Craig: Because there's obviously a very difference [sic] in perception –
     Ms. Crampton: There is.
     Ms. Craig: – between – but honestly from what I've seen from you, I've seen you be very disrespectful.
     Ms. Crampton: Because you haven't been around, Robbi, to see what's going on.

7

No. 17-51126

Crampton filed this lawsuit in state court against DADS, Rodriguez in her official and individual capacities, and DADS Commissioner Jon Weizenbaum in his official and individual capacities. She alleged that Rodriguez terminated her in retaliation for complaining about Rodriguez's resume policy in violation of the Texas Whistleblower Act, the First Amendment to the United States Constitution, and Article 1, § 8 of the Texas Constitution.[5] The defendants removed the lawsuit to the federal district court. After briefing on the defendants' motion for summary judgment was complete, Crampton moved to supplement the record with a declaration from Grassmuck, Crampton's original supervisor. In a single order, the district court denied Crampton's motion to supplement and granted the defendants' motion for summary judgment. Crampton appeals.

## II.

We review orders granting summary judgment de novo, applying the same standard as the district court. *See Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2017). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact means that [the] 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When the nonmoving party will bear the burden of persuasion at trial and "the moving party initially shows the non-movant's case lacks support, 'the non-movant must come forward with "specific facts" showing a genuine factual

---

[5] Crampton brings her First Amendment claims via 42 U.S.C. § 1983. Texas has no § 1983 analog, so her § 8 claim is limited to injunctive relief. *See City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995).

issue for trial.'" *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quoting *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002)). "Although we draw all reasonable inferences in favor of the nonmovant at the summary judgment stage, a mere 'scintilla of evidence' in support of [the nonmovant's] position will not do, nor will 'some metaphysical doubt as to the material facts.'" *Funches v. Progressive Tractor & Implement Co.*, 905 F.3d 846, 849 (5th Cir. 2018) (per curiam) (citations omitted) (first quoting *Anderson*, 477 U.S. at 252, then quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). When the moving party will bear the burden of persuasion at trial, "evidence must be adduced supporting each element of the defense and demonstrating the lack of any genuine issue of material fact with regard thereto." *Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).

We first address whether a reasonable jury could find for Crampton on her Texas Whistleblower Act claim. We then ask the same of Crampton's First Amendment and § 8 claims.

## A.

The Texas Whistleblower Act makes it unlawful for a "state or local governmental entity [to] suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." Tex. Gov't Code § 544.002(a). The Texas Supreme Court has held that causes of action under the Texas Whistleblower Act carry a but-for causation requirement—that is, the employee must prove that if she had not reported a violation of the law, she would not have suffered an adverse employment action. *See Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995). If a Whistleblower Act plaintiff shows her protected activity was a factor in her termination, the

defendant may nonetheless prevail if it shows, as an affirmative defense, that it would have terminated the plaintiff regardless of whether she engaged in protected activity. Tex. Gov't Code § 544.004(b); *see also Fort Worth Indep. Sch. Dist. v. Palazzolo*, 498 S.W.3d 674, 681 (Tex. App.—Fort Worth 2016, pet. denied).

**1.**

All parties agree that Crampton was a public employee who was terminated. We assume arguendo that Crampton reported a violation of the law in good faith to an appropriate authority. But we agree with the district court that Crampton cannot establish that she would not have been terminated if she had not reported Rodriguez's perceived wrongdoing.

Whistleblowers may rely on circumstantial evidence to show causation. *See Houston v. Levingston*, 221 S.W.3d 204, 226 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

> Such evidence includes: (1) knowledge of the report of illegal conduct, (2) expression of a negative attitude toward the employee's report of the conduct, (3) failure to adhere to established company policies regarding employment decisions, (4) discriminatory treatment in comparison to similarly situated employees, and (5) evidence that the stated reason for the adverse employment action was false.

*City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex. 2000). "But evidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's report of illegal conduct is not enough, standing alone, to show a causal connection between the two events. There must be more." *Id.*

Crampton points to three pieces of evidence that, she says, would allow a reasonable jury to infer that Rodriguez terminated her because of her protected activity. First, Crampton argues that Craig's handwritten notes show that DADS officials discussed Crampton's whistleblowing during the

April 1 meeting at which Rodriguez decided to terminate Crampton. Specifically, Craig wrote "OIG, civil rights," "Michael McCall's [sic] office – letter," and "fraud" in apparent references to Crampton's complaints to the OIG and U.S. Representative Michael McCaul and her allegation that Rodriguez fraudulently recreated missing letters. Crampton insists that these notes support an inference that her protected activity factored into Rodriguez's decision to terminate her. We disagree. Without further context, these notes establish, at most, that Rodriguez knew about Crampton's protected activity.

The cases Crampton cites do not add any significance to Craig's notes. Crampton argues that *Torres v. City of San Antonio*, No. 04-15-00664-CV, 2016 WL 7119056 (Tex. App.—San Antonio Dec. 7, 2016, no pet.) (mem. op.), "is directly on point." The plaintiff in that case—a firefighter—was passed over for a promotion after complaining that an assistant fire chief was granting certain firefighters improper credentials, which allowed them to access an arson-investigation facility. *Id.* at \*1. The evidence showed that two decisionmakers "both stated Torres's credential complaint was the reason Torres was not selected for the Arson lieutenant position." *Id.* at \*5. Indeed, the fire chief "acknowledged that the interview panel considered Torres's [Office of Municipal Integrity] report as a factor in its decision-making process" and "testified that Torres's complaint 'should never have gone to OMI.'" *Id.* This is direct evidence of causation, and it is about as strong as it gets. Craig's notes are incomparable.

Crampton's reliance on *Glorioso v. Mississippi Department of Corrections*, 193 F.3d 517, 1999 WL 706173 (5th Cir. 1999) (unpublished table decision) (per curiam), is similarly unavailing. One of the decisionmakers in *Glorioso* recommended terminating the plaintiff because of her negative attitude towards a superior. *Id.* at \*4. But, akin to *Torres*, the decisionmaker expressly cited the plaintiff's protected activity—a grievance alleging sexual

harassment—as the sole example of her negative attitude. *See id.* at *4. Likewise, in *Gardner v. CLC of Pascagoula, L.L.C.*, 894 F.3d 654 (5th Cir. 2018), this court found direct evidence of a causal link between the plaintiff's protected conduct and termination. The plaintiff in that case, a certified nursing assistant, alleged that a patient sexually harassed her, so she refused to treat that patient. In terminating the plaintiff, the plaintiff's supervisor cited her "refusal to provide [the patient] care." *Id.* at 664. We explained: "That refusal to continue treating [the patient] is what Gardner alleges is the protected activity of opposing an unlawful employment practice." *Id.*

*Ion v. Chevron USA, Inc.*, 731 F.3d 379 (5th Cir. 2013), is slightly more helpful to Crampton's case, but it too fails to carry her argument. The plaintiff in that case took time off under the Family and Medical Leave Act ("FMLA") following a suspension. In the plaintiff's subsequent termination letter, the employer wrote, "[Y]ou haven't returned to work since your suspension." *Ion*, 731 F.3d at 391. The employer argued that this was "merely a factual statement," but we held that a reasonable jury could conclude it showed that the employer impermissibly took the plaintiff's FMLA leave into account. *See id.* at 391-92.

*Ion* is distinguishable from the case at hand. The jury in that case could read the statement about the plaintiff's FMLA leave in the context of the rest of the termination letter to reach its own conclusions about the statement's significance. The jury here does not have that luxury with Craig's out-of-context scribblings. Any conclusion that attendees at the April 1 meeting discussed Crampton's protected activity as a reason for her termination would be improperly speculative. *See, e.g.*, *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015) ("A non-movant will not avoid summary judgment by presenting 'speculation, improbable inferences, or

unsubstantiated assertions.'" (quoting *Likens v. Hartford Life & Accident Ins. Co.*, 688 F.3d 197, 202 (5th Cir. 2012))).

Indeed, another part of *Ion* demonstrates the flaw in Crampton's argument. The plaintiff separately argued that the term "insubordination" in his termination letter was a reference to his alleged protected activity—refusing to sign a medical release form. *Ion*, 731 F.3d at 391. We explained that, even when interpreting all facts and drawing all inferences in the plaintiff's favor, the meaning of "insubordination" in the termination letter did "not rise above speculation." *Id.* The same is true here: even with the benefit of the doubt owed to Crampton on summary judgment, we can only speculate about whether the references in Craig's notes to the OIG, Representative McCaul, and fraud mean Rodriguez considered Crampton's protected activity in deciding to terminate her.

Next, Crampton argues that the timing of her termination creates an inference of causation. Under the Whistleblower Act, if a public employee is terminated within 90 days of reporting the violation, the employee is entitled to a rebuttable presumption of causation. *See* § 554.004(a). This presumption shifts the burden to the employer to produce sufficient evidence of a permissible reason for the employee's termination. *See Levingston*, 221 S.W.3d at 226. Once the employer meets this burden, "the case proceeds as if no presumption had ever existed." *Id.*

Here, Crampton was terminated within weeks of reopening her complaint to the OIG. But to the extent that this triggers § 554.004(a)'s presumption of causation, the defendants sufficiently rebut that presumption by producing a plethora of evidence that Rodriguez terminated Crampton for her continual and unrepented unprofessional behavior. *See Levingston*, 221 S.W.3d at 226. Therefore, "this case proceeds as if no presumption had ever existed." *Id.*

No. 17-51126

Without the presumption, we agree with the district court that "[t]he timing of Crampton's termination is less suspect than suggested." Crampton provided new information to the OIG on March 29, 2016, the day *after* Rodriguez presented Crampton with the third-level reminder. Accordingly, Crampton cannot credibly argue that the third-level reminder came in response to her complaint to the OIG. Further, Crampton's supervisors—first Grassmuck and then Rodriguez and Bourland—began counseling Crampton about her unprofessional behavior well before Crampton engaged in any protected activity.[6] And lastly, given the prolificacy of Crampton's complaints, it is entirely unsurprising that Crampton's termination came in close proximity to one of her complaints. Inferring causation from proximity under these circumstances would allow a whistleblower to permanently protect her job as long as she continually complains about illegal behavior. We doubt the Texas legislature or courts would endorse such a result. *Cf. Hinds*, 904 S.W.2d at 633 (declining to follow literal language of Whistleblower Act because doing so "would give public employees life tenure for reporting activity believed in good faith to be unlawful").

Lastly, Rodriguez's deposition testimony that she considered "[e]verything that's happened so far" in deciding to terminate Crampton is too vague to create a reasonable inference of causation. *Cf. Gardner*, 894 F.3d at 664 (finding jury could infer causation because specific reason decisionmaker cited for plaintiff's termination was exactly "what Gardner allege[d] [was] the protected activity of opposing an unlawful employment practice"); *Torres*, 2016 WL 7119056, at *5 (concluding jury could infer causation because decisionmaker "acknowledged that the interview panel considered Torres's

---

[6] We do not find it relevant that DADS did not consider this initial counseling to be formal discipline. Either way, it is undisputed that Crampton's supervisors were unhappy with her workplace demeanor prior to any of her protected activity.

14

No. 17-51126

[Office of Municipal Integrity] report as a factor in its decision-making process").

Taken together, Crampton's evidence does not create a reasonable inference of causation. The "scintilla of evidence" of causation that Crampton does present is insufficient to carry her burden on summary judgment. *Anderson*, 477 U.S. at 252; *cf. City of El Paso v. Parsons*, 353 S.W.3d 215, 226-27 (Tex. App.—El Paso 2011, no pet.) (concluding jury could infer causation because decisionmaker knew about protected activity and evidence suggested stated reason for termination was pretextual); *Levingston*, 221 S.W.3d at 227-29 (finding jury could infer causation because (1) decisionmaker knew about protected activity; (2) decisionmaker expressed annoyance with protected activity; (3) decisionmaker departed from normal city procedure in terminating plaintiff; and (4) plaintiff presented "ample evidence" of pretext).

**2.**

Alternatively, we conclude that the defendants are entitled to summary judgment because the unrebutted summary-judgment "evidence conclusively establishes that any possible consideration by [Rodriguez] of the fact that [Crampton] made a report was only superfluous to the adverse employment action and that the action would have occurred regardless of the fact of the report." *Steele v. City of Southlake*, 370 S.W.3d 105, 118-19 (Tex. App.—Fort Worth 2012, no pet.) (citing § 554.004(b)).[7] Although an affirmative defense, Texas courts routinely will grant summary judgment to a Whistleblower Act defendant that produces sufficient unrebutted evidence that it would have

---

[7] Crampton argues that the defendants waived their § 554.004(b) argument by failing to raise it below. Although the defendants primarily argued they had an identical affirmative defense to Crampton's First Amendment retaliation claim (discussed further, *infra*), they noted in their reply below that the defense also applies to Crampton's Whistleblower Act claim. We may thus consider it. *See, e.g., Gilbert v. Donahoe*, 751 F.3d 303, 311 (5th Cir. 2014) (explaining we may affirm on any ground, "so long as the argument was raised below").

terminated the plaintiff regardless of the plaintiff's protected activity. For example, the Texas Court of Appeals suggested that the plaintiff in *Steele*, a police officer, produced sufficient evidence for a jury to conclude he was terminated in part because he reported a pattern of wrongdoing by senior officers. *See id.* at 118. Nevertheless, the court affirmed summary judgment for the defendants because the defendants produced unrebutted evidence that the plaintiff had used another officer's identity to send an email to city officials. *Id.* at 120. The court found it undisputed that such dishonesty is a terminable offense for a police officer. *Id.* at 121-25. It accordingly concluded that "based upon the summary judgment evidence that appellees presented and upon the lack of evidence by appellant to raise a genuine issue of material fact that he would not have been fired based on his untruthfulness, . . . appellees conclusively proved their entitlement to summary judgment on the affirmative defense of section 554.004(b)." *Id.* at 125-26.

The same court reached a similar decision in *Lopez v. Tarrant County*, No. 02-13-194-CV, 2015 WL 5025233 (Tex. App.—Fort Worth 2015, pet. denied) (mem. op.). The plaintiff in *Lopez*, an executive assistant to a county commissioner, sued the county alleging she was fired for reporting that another county employee had assaulted her. *Id.* at \*1, \*3. The court affirmed summary judgment for the county because it determined the county conclusively established § 554.004(b)'s affirmative defense. *Id.* \*5. Specifically, the court pointed to the mostly unrebutted evidence that the plaintiff was terminated for her behavior in a meeting with her supervisor, which "included 'shouting, being insubordinate, disrespectful, confrontational and making accusations which [the plaintiff] later admitted were untrue.'" *Id.* at \*6; *see also Vela v. City of Houston*, 186 S.W.3d 49, 55 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (affirming summary judgment for defendant because plaintiff

had "not presented a scintilla of evidence to refute the City's reason for his termination").

Here, even assuming a jury could reasonably conclude that Crampton's protected activity partially motivated Rodriguez to terminate her, a jury could not reasonably conclude that Rodriguez would have reached a different decision in the absence of Crampton's protected activity. The defendants presented myriad evidence of Crampton's workplace issues dating back almost a year prior to her termination. This evidence includes declarations from Rodriguez, Bourland, and Craig, their contemporaneous emails, Crampton's two reminder memoranda, Crampton's notice of possible disciplinary action, and the recording and transcript of the April 1 meeting. All this evidence reveals a clear and unabated pattern of disrespectful, insubordinate, and unprofessional workplace behavior from Crampton.

The defendants also presented the DADS human-resources policy, which discusses DADS' progressive-discipline system. The policy lists "failure to work in harmony with others" as a "serious offense," and it lists "insubordination" as a "major offense." First-time serious offenses generally warrant a second-level reminder, while continued serious offenses and first-time major offenses generally warrant a third-level reminder. The policy prescribes termination for certain repeat violations, including "fail[ing] to meet written job performance standards" and "fail[ing] to work in harmony with coworkers." Rodriguez thus acted according to the human-resources policy in disciplining and ultimately terminating Crampton for her unharmonious and occasionally insubordinate behavior.

We conclude this evidence is sufficient to show that Rodriguez would have terminated Crampton regardless of her protected activity. Accordingly, the defendants are entitled to summary judgment on their § 554.004(b) affirmative defense unless Crampton can show a genuine factual dispute.

17

No. 17-51126

Crampton seeks to create a fact question by arguing that Rodriguez disciplined Becky Nelson, another DADS employee, less severely than Crampton for similar conduct. But she does not present sufficient evidence of Nelson's conduct for a jury to conclude—at least absent speculation—that Nelson's conduct was at all comparable to Crampton's. In her reply brief, Crampton cites to Craig's deposition, which reveals that Nelson received a first-level reminder for (1) sending an argumentative email, (2) sending an email outside of work hours, and (3) using an inappropriate tone of voice with Rodriguez. No reasonable jury could conclude that this is comparable to the dozens of incidents over a period of months for which Crampton was disciplined. *See Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (reversing jury verdict in disparate-treatment discrimination case because "even though the female employees worked in the same department and were subject to the same time clock rules, there is no evidence that their respective misconduct was of 'comparable seriousness'" (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973))).

Crampton further points to Craig's notes and Rodriguez's testimony that she considered "[e]verything" when she decided to terminate Crampton as evidence that negates the defendants' affirmative defense. But this evidence cannot play double duty. The most this evidence could show is that Crampton's protected activity was a motivating factor in her termination;[8] it does not negate the evidence that Rodriguez would have terminated Crampton regardless of her protected activity. As the Texas Court of Appeals explained in *Steele*, "circumstantial evidence of retaliation is immaterial when an employer proves an independent basis for an adverse employment action." 370 S.W.3d at 119; *see also Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388

---

[8] Although, as explained above, it does not even show this much.

18

No. 17-51126

(Tex. 2005) (concluding circumstantial evidence may "support[] a causal link between Hernandez's termination and her filing a workers' compensation claim" but explaining such evidence was "immaterial if Hernandez's termination was required by the uniform enforcement of Haggar's one-year leave-of-absence policy").

Crampton points to no evidence showing that (1) she did not engage in the behavior for which she was purportedly terminated; (2) her behavior did not constitute an objectively terminable offense; (3) her behavior did not subjectively factor into Rodriguez's decision; or (4) Rodriguez's stated reason for her termination was otherwise pretextual. Thus, the undisputed evidence conclusively shows that Rodriguez would have terminated Crampton regardless of her protected activity, and the defendants are entitled to summary judgment on their § 554.004(b) affirmative defense.

**B.**

We now turn to Crampton's First Amendment and § 8 retaliation claims. To state a First Amendment retaliation claim,[9] a public employee must show that she "spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). If the employee makes this showing, then the court must weigh "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* Further, the employee must show that her protected

---

[9] The parties treat Crampton's First Amendment and § 8 claims as coterminous. The district court followed this approach too. The Texas Supreme Court has explained that § 8's protections are not necessarily identical to the First Amendment's protections. *See Bentley v. Bunton*, 94 S.W.3d 561, 578-79 (Tex. 2002). But in cases "[w]here, as here, the parties have not argued that differences in state and federal constitutional guarantees are material to the case, and none is apparent, [the Texas Supreme Court] limit[s] [its] analysis to the First Amendment and simply assume[s] that its concerns are congruent with those of article I, section 8." *Id.* at 579. Accordingly, we analyze Crampton's First Amendment and § 8 claims together, applying federal law.

19

speech led to an adverse employment action against her. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285 (1977). In assessing causation, the initial burden is on the employee to show that the protected speech "was a 'motivating factor'" in the public employer's decision to discipline the employee. *Id.* at 287 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 (1977)). The burden then shifts to the employer to show that it would have taken the same action regardless of the employee's speech. *See id.*

As with Crampton's Whistleblower Act claim, we assume without deciding that Crampton engaged in protected activity by speaking as a citizen on a matter of public concern. But Crampton's First Amendment and § 8 claims fail for the same reason as her Whistleblower Act claim: want of causation.[10] Crampton presents the same evidence of causation in support of her First Amendment and § 8 claims. She asserts that a jury could infer that her protected speech motivated her termination, at least in part, because of (1) the references in Craig's notes to the OIG, Representative McCaul, and fraud, (2) the timing of her termination, and (3) Rodriguez's comments that she considered "[e]verything" when she decided to terminate Crampton. For the reasons explained above, this "scintilla of evidence" cannot propel Crampton beyond summary judgment. *Anderson*, 477 U.S. at 252.

Alternatively, the defendants prevail on the second prong of the *Mt. Healthy* test because the undisputed evidence shows that Rodriguez would have terminated Crampton regardless of whether she engaged in protected activity. *See* 429 U.S. at 287. Crampton puts forth no evidence disputing that she engaged in a long pattern of disrespectful, insubordinate, and

---

[10] Notably, the Texas Supreme Court explicitly adopted the *Mt. Healthy* standard as the standard for assessing causation under the Whistleblower Act. *See Hinds*, 904 S.W.2d at 635-36.

unprofessional workplace behavior. Nor does she dispute that her continual behavior arose to a terminable offense. Accordingly, even assuming Crampton's protected speech "was a 'motivating factor'" in her termination, the defendants are nevertheless entitled to summary judgment. *Id.* at 287 (quoting *Arlington Heights*, 429 U.S. at 270).

## III.

We also conclude the district court did not abuse its discretion in denying Crampton's motion to supplement the summary-judgment record with Grassmuck's declaration after discovery had closed and briefing on the defendants' motion was complete. *See Meaux Surface Prot. v. Fogleman*, 607 F.3d 161, 167 (5th Cir. 2010). Crampton protests that she "had been attempting to obtain the declaration since July 17, 2017 in order to meet her filing deadline of July 21, 2017, [but] Grassmuck did not sign the declaration until August 1, 2017." Discovery had been open for more than 10 months at that point; Crampton offers no explanation for why she did not ask Grassmuck to sign the declaration until four days prior to her deadline to respond to the defendants' summary-judgment motion. Without even attempting to justify such a delay, Crampton cannot show the good cause needed to modify the district court's scheduling order. *See* Fed. R. Civ. P. 16(b)(4).

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.